LAURIE JO ZIEBARTH, APPELLEE AND CROSS-APPELLANT, V. JAMES JAY ZIEBARTH, APPELLANT AND CROSS-APPELLEE.

471 N.W.2d 450

Filed July 5, 1991.   No. 90-952.

Marsha E. Fangmeyer, of Knapp, Mues, Beavers, Luther & Fangmeyer, for appellant.

Steven O. Stumpff, of Stumpff Law Office, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

WHITE, J.

After a trial in Franklin County District Court, the marriage of Laurie Jo and James Jay Ziebarth was dissolved. The husband was awarded custody of the minor son and the wife was awarded custody of the minor daughter. The husband has appealed, alleging that the district court abused its discretion in dividing the custody of the two minor children, in ordering him to pay child support and $5,000 toward the wife's attorney fees, in incorrectly valuing the marital estate, and in awarding a money judgment to the wife. The wife cross-appeals, also asserting that the trial court abused its discretion in splitting custody of the children and asserting error in its failure to award alimony.

James and Laurie Ziebarth were married on July 31, 1982, and had two children: Tyler, born May 12, 1984, and Jillian, born June 5, 1988. The petition for dissolution was filed on January 3, 1990. A temporary order was entered which divided custody of the children between the parents. Following a hearing, the court entered its final decree on August 9, 1990. Although the guardian ad litem had recommended that the children be placed with James, the court continued the split custody arrangement—the son, Tyler, to James, and the daughter, Jillian, to Laurie. A visitation schedule was devised which provided that the children were together each weekend, alternating between the mother and the father; together with each parent for 6 weeks in the summer and on alternating

holidays; and together with the mother on Mother's Day and the father on Father's Day. The father was ordered to pay $200 per month child support. James was allowed the dependent tax exemptions and was ordered to provide medical insurance and to pay for any uncovered medical, dental, and optometric expenses. Neither party was awarded alimony. The marital property was divided, and the wife was awarded a money judgment of $13,385. James was also ordered to pay $5,000 toward Laurie's attorney fees and to pay two-thirds of the guardian ad litem's fee of $3,740.96, with Laurie to pay the remaining one-third.

The record indicates that James is a self-employed farmer and was formerly employed by the family farm corporation. Laurie is employed in the respiratory care unit of a hospital in Holdrege, Nebraska, and has worked toward a respiratory therapy degree. The parties agree about little else. This record is replete with accusations and allegations, and we provide details on the charges merely to demonstrate the vitriolic nature of the divorce and to illustrate some of the reasons for our decision to reverse the trial court and award sole custody of both children to the father, James.

## FACTUAL BACKGROUND

Laurie was 19 when she married after meeting James when both were students at the University of Nebraska-Lincoln. She attended UNL for 1 year, majoring in preveterinary science. Although Laurie told James that she had earned 120 credit hours by the end of the summer following her freshman year because she had tested out of a number of classes, she transferred only 5 credit hours to Kearney State College. She attended KSC at various times between 1981 and 1989, earning 62 credit hours, but she has not received a degree.

James attended UNL for 2 years before returning to farm near Wilcox, Nebraska, where he and Laurie lived during the marriage. He stated that his first priority is his family and that he always quit working in the fields at 5 or 6 p.m. to go home to fix dinner. He said he has been the primary caretaker for the children almost since birth. Throughout the marriage, Laurie repeatedly threatened divorce and had left for 2 weeks in 1989

and told James he could not see the children during that time. Laurie accused him of having a drinking problem, but he denies any difficulty with alcohol. James said he took part in an alcohol evaluation, but no evidence of the evaluation was offered at trial.

After her marriage to James, Laurie enrolled in a radiology program at Mary Lanning Hospital in Hastings and respiratory therapy programs in Grand Island and in Omaha, but has not completed any course of training. She testified at trial that she would finish her certification for respiratory therapy by November 1990. When she attended the respiratory therapy program in Omaha at Immanuel Medical Center, Jillian was 3 months old and Tyler was 4 years old, and she took the children with her for much of the time. Laurie said James had the children 1 week out of 4, but James said he had them half of the time. She told James that her expenses were covered by student loans and grants, but he later discovered that she had charged $3,000, the limit on a credit card, to pay for her expenses. James said she spent $8,000 in 4 months and did not complete the program.

Laurie stated that James verbally encouraged her to continue her education, but then threatened to take away a vehicle so that she would not be able to attend school. She also accused him of calling her late at night before an exam to harass her.

Cindy Benjamin, a respiratory therapist in Lexington, testified that she and Laurie studied together while in Omaha and that Laurie was a loving mother. She said there were times when Laurie would be crying after a phone call from James. Benjamin said she heard one phone call in which James called Laurie a "bitch" and a "whore."

As part of the program at St. Francis Medical Center in Grand Island, Laurie agreed to work for 1 year in exchange for assistance with attaining certification in respiratory therapy. She failed to complete the program and owed the center $600. Eventually, her wages were garnished to pay the bill.

Each party accuses the other of physical abuse. Laurie said that when Jillian was 3 weeks old, James had come home intoxicated. Laurie was feeding Jillian in bed and bumped James in the back while getting out of bed. James then kicked

her until she fell out of bed with Jillian in her arms. James denies that incident, along with most of the other accusations made by Laurie. James testified that he never hit his wife, but that she hit him on three occasions. A farmhand for Ziebarth Farms, Inc., Roger Blank, stated that James came to work once with a cracked lip and puffy eyes and told him that his wife had hit him.

Another problem resulted from a difference of religion. Laurie said she had the children baptized in the Catholic Church, but that James is Lutheran. Laurie claimed to take Tyler to "C.C.D. classes" at the Catholic church and to attend church regularly, but later admitted that it was Tyler's aunt who normally took him to church and that she did not attend on a weekly basis. Tyler also attended Bible school at a Lutheran church. James said neither he nor Laurie attended church regularly while married.

A great deal of testimony was provided alleging that Laurie lies, tells stories, and embellishes the truth. When the children were enrolled at KinderCare in Omaha, Laurie indicated on the application form that she had completed college. Donette Johnson, a licensed day-care provider who took care of the Ziebarth children, stated that on the day Laurie left James, Laurie brought Jillian to Johnson's house and said she had to take Tyler to the doctor. When she returned, Johnson asked about Tyler, and Laurie told her she was leaving James and she had taken Tyler to help her move furniture out of the house.

Kirk Gardels, who has known James most of Gardels' life, stated that he and his wife quit seeing James and Laurie about 6 months after the Ziebarths were married because they found Laurie to be untrustworthy and prone to tell stories. She told them that she was a backup singer for John Denver, that she had almost completed veterinary school, that she was unable to get pregnant and they were going to adopt, that she was valedictorian of her high school class, and that she was a cheerleader.

Laurie told Rene Saldivar, another of James' friends, that she had worked at the cancer unit at a hospital, that she almost made the Olympic ski team, and that she almost finished veterinary school. Another friend, Ron Lush, said that Laurie

could outdrink anyone and that she told him that her "best" in the last 6 months had been drinking 20 shots of tequila in one evening.

James' college roommate, Terry Anderson, said that Laurie tells lies to impress others and that she stated that she had a heart condition and had been advised not to smoke and drink, but he said that she smoked and drank anyway.

Laurie's father stated that Laurie told people she could not visit her uncle because her cousin had burned in a fire and everyone blamed Laurie for it. Laurie's father said that the cousin died from shotgun wounds, that Laurie was not present when the incident occurred, and that no one blames her for it.

James testified to several examples of stories he was told by Laurie. She had told him that she was working for a professor at Kearney State College. When Laurie's mother went to take Laurie to lunch, she found that no one in the office knew Laurie. James called the office to ask for tax information and found out that Laurie did not work for the professor, but that he was her advisor. Laurie told James that she had numerous health problems, including a brain tumor and heart difficulties, but when he asked why she had not marked these on an insurance form, she admitted they were lies. She told James when he met her that she was in the process of moving to Ft. Collins, Colorado, to finish her veterinary training and that she had one semester left. She also told him early in the marriage that she had a very large savings account and inheritance from her father and that she owned land and skyscrapers in Denver. When James asked for information for tax purposes, he was told that it was in a partnership or a holding company under another name and that they did not need to report anything. Laurie also told James that she was class president and a regents scholar at UNL.

Laurie denied most of these stories and said she never told anyone that she was a backup singer for John Denver or that she was on the Olympic ski team. She denied telling anyone that she had drunk 20 tequilas in one evening.

Discipline was also a point of contention. Laurie said she believes children need structure and boundaries, but that James lets the children run free. Laurie said that she never hit Tyler on

the face with her hand, but that she did spank him. She said James tends to favor Tyler over Jillian and at times did not acknowledge Jillian. James said that during their separation he was not allowed to see Jillian when he went to pick up Tyler from visitation.

During the trial, Laurie accused her father of verbal, emotional, physical, and sexual abuse. She said that he dragged her by her hair, threw her down stairs, forced her to sleep in a doghouse, touched her on the breasts, and had sexual intercourse with her when she was 7 years old. She said she had not communicated with her father for 7 years, but he walked her down the aisle at her wedding and she sang at his wedding when he was remarried. She said she told James 2 years earlier about the sexual abuse, but never told anyone else until after she was separated from James, when she told her mother.

Laurie told James that her father had sexually abused her, her sister, and his stepdaughter, but James said that earlier she had told him her grandmother's second husband had abused her.

Laurie and her mother both contacted Governor Kay Orr, who had named Laurie's father to a state board. They passed on the sexual abuse allegations and questioned the Governor's wisdom in appointing her father to the state board.

Laurie's father denied her accusations and said that he first learned of the allegations after James and Laurie split up. Laurie also accused him of sexually abusing his stepdaughter and of causing problems in his stepdaughter's marriage, even though his stepdaughter was not married.

Laurie's sister said that there was no truth to any of the abuse accusations, which she first learned of approximately 2 months before trial when her mother called and said Laurie needed her help in fighting for custody. Laurie's sister also later received a phone call and letter from Laurie asking her to help.

Laurie's father said he offered to set up a trust fund for the Ziebarth children but Laurie refused, saying it was not necessary. Laurie said she did not trust his motive for the offer. Laurie's father gave her $2,000 as a loan, but she refused to pay it back. The canceled checks were admitted into evidence, and one for $1,000 indicates it was a "loan," and the other for

$1,000 indicates it was for "cash." Her father said that when he asked Laurie what her intentions were about paying it back, she told him that if he wanted the money he could take her to court and sue her.

Laurie said she had a bedroom for Tyler built in the basement and that she paid for it with her own money. However, a memo in evidence indicates that the cost of the remodeling was $406 and a balance of $334.40 remains.

Laurie's witnesses included Dr. Bernard Douglas, the children's pediatrician, who testified that he has worked with Laurie at the Holdrege hospital and has seen her when she brought the children in for appointments. He said he considered her one of the better respiratory therapists and had no problems with her truth or veracity.

The director of respiratory care at the Holdrege hospital, Steven Davis, testified that he tries to coordinate Laurie's schedule with that of her mother, who is a nurse at the hospital, so that they do not overlap. Davis testified that he works with Laurie for about 6 hours a week and that Laurie has a satisfactory job performance, with no drug or alcohol problems, and he has no knowledge of any trouble with her truth and veracity. He said that Laurie has taken the licensing exam for respiratory therapy, but that the results were not released because she did not finish the schooling in the correct amount of time.

Jeannie Blausey, a certified professional counselor who has had 13 sessions with Laurie, testified that she learned of Laurie's accusations against her father from James and that Laurie had not mentioned them to Blausey. She suggested Laurie needed regular therapy and should attend Al-Anon or Adult Children of Alcoholics meetings and that she anticipates a long relationship with Laurie.

A number of friends testified that James is an honest, caring person who has a positive relationship with his children. Gardels said Laurie once told James that she was tired of the children and that James should take them. After the separation, Gardels often accompanied James to pick up the children for visitation, and he said Laurie made it a condition of visitation that James not allow the children to see either

grandfather. Gardels said the children were present when Laurie accused her father of sexual abuse.

Rene Saldivar, who has known James for 17 years and has taken trips with James and Laurie and his wife, said that Tyler seems happier when he is with his father than with his mother. He said that Laurie has an up-and-down personality and that once when James was 10 minutes late getting home when the Saldivars and Laurie were preparing to leave for a camping trip, Laurie said she was not going. She later decided to go, but punished James by making him do the packing. Saldivar said that Laurie is verbally abusive toward James and that James responds by doing what he is told. Laurie is a screamer when it comes to discipline, and Tyler seems nervous and edgy around her, Saldivar said.

Grace Adam testified that at a birthday party, Tyler looked as if he was afraid of his mother. Lush stated that Laurie is harsh with Tyler and that Tyler seems fearful of her. Terry Anderson stated that Tyler was frequently afraid of his mother, who was short tempered and always scolding. Sheri Anderson stated that Laurie was hard on Tyler and that his personality was different when around his father. She said she never knew whether to believe what Laurie told her.

After the separation, James had some difficulties in visiting his children. Laurie told him she would not let him have Tyler under the conditions in James' house, but would not explain what she meant. Laurie told James that she was willing to put Tyler in hiding and that she would go to jail for him.

James testified to a confrontation with Laurie and Laurie's mother, over Laurie's father seeing the children. Laurie's mother had accused James of being guilty of sexual abuse by letting the children see Laurie's father, had called James "dumb river rat white trash," and had said, "I'll kill you." Laurie had told James to get away from her mother or she would have her "uncle send some men down in seconds flat." Laurie apparently has said her uncle had connections with the Mafia in Las Vegas.

James said that Laurie's mother also had difficulty telling the truth and that she had claimed they had always had nice kennels, while Laurie's father said they never even owned a doghouse. James said that he is concerned that Laurie is trying

to alienate the children and that during the separation she did not let him call the children on their birthdays, but instead hung up or put Jillian to bed before he could talk to her.

## STANDARDS OF REVIEW

" 'In an appeal involving an action for dissolution of marriage, the Supreme Court's review of a trial court's judgment is de novo on the record to determine whether there has been an abuse of discretion by the trial judge, whose judgment will be upheld in the absence of an abuse of discretion. In such de novo review, when the evidence is in conflict, the Supreme Court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.' "

*LaBenz v. LaBenz*, 237 Neb. 231, 232, 465 N.W.2d 726 (1991), quoting *Huffman v. Huffman*, 236 Neb. 101, 459 N.W.2d 215 (1990). Our de novo review of the record results in our decision that the more stable environment for both children is with the father and that it is in the children's best interests to be placed in his sole custody.

"When the custody of minor children is involved in a dissolution proceeding, the custody is determined by the fitness of each parent and the best interests of the children." *Applegate v. Applegate*, 236 Neb. 418, 419, 461 N.W.2d 419, 420 (1990). Under Nebraska law, the inquiry into providing for the best interests of the children

includes, but is not limited to, a consideration of the relationship of the children to each parent and the general health, welfare, and social behavior of the children. We have said that we also look to the moral fitness of the parents, including their sexual conduct; the respective environments each offers; the emotional relationship between the child and the parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the capacity of each parent to provide physical care and to satisfy the needs of the child.

*McDougall v. McDougall*, 236 Neb. 873, 877, 464 N.W.2d 189, 192 (1991). We agree with the finding of the trial judge that either parent could meet the needs of these children, but we find that the attitude and stability of the mother and the emotional relationship between her and the children is questionable and that the children deserve the opportunity of the more secure environment which can be provided by the father.

## CHILD CUSTODY

Thomas Lieske, the guardian ad litem, completed an investigation and report which concluded that the father is the more stable of the two parents and that he could provide a more nurturing environment. The guardian ad litem expressed concern about the apparent desire of the mother to sever relationships, and the effect that might have on visitation should she be awarded custody. The mother's past work and school history evidenced a lack of ability to follow through on activities. Her tendency to fabricate or embellish could have an effect on the children and their ability to perceive reality, Lieske noted. He said that Tyler had stated that he missed his sister during the time when they were separated.

As we have previously noted, " ' " '[t]he judgment concerning the custody of children is necessarily quite subjective in nature. Many factors may be considered in light of the particular circumstances of each individual case.' " ' " *Moeller v. Moeller*, 215 Neb. 360, 362, 338 N.W.2d 749, 751 (1983).

A psychological evaluation of both parties was completed by Dr. John Meidlinger, a clinical psychologist, who recommended James as the parent more likely to provide emotional and physical stability and to be able to cooperate with visitation schedules.

Evidence was presented which indicates that James has taken a major role in child rearing and housekeeping since the children were born. While Laurie stated that she did most of the work around the house, James testified that he took part in all aspects of child care, including changing diapers, bathing, and feeding, as well as doing household chores, including doing the laundry, vacuuming, dusting, kitchen and bathroom cleaning,

and cooking. His testimony was supported by affidavits and testimony at trial which indicated that James quit his farming operation at 6 p.m. in order to help at home. The day-care operator testified that James regularly brought the children and supplies for their needs to day care and that he always responded if she called when the children were sick or had an emergency. Laurie provided no evidence other than her own testimony to dispute any of this information.

The guardian ad litem also expressed concerns about Laurie's alienation of family. James testified that she refused to attend Ziebarth family gatherings. When Laurie and James first separated, Laurie made it a condition for James' visitation that he not allow his father to see the children. The trial court issued an order during the pendency of the action stating that all grandparents were allowed visitation.

Laurie's relationships with her father and her sister also indicate difficulties in sustaining family ties. Her allegations against her father were raised only after she was separated from James, and the allegations were rebutted by her sister, who testified that she received a threatening letter from Laurie. We make no finding as to the credibility of the charges, but note that it is disturbing that the charges were made and were made in the presence of the children. There was also a great deal of evidence from friends who had severed ties with James and Laurie because of difficulties in getting along with Laurie.

We have stated that it is sound public policy to keep children together when a marriage is dissolved. See, *Boroff v. Boroff*, 197 Neb. 641, 250 N.W.2d 613 (1977); *Richey v. Richey*, 216 Neb. 565, 344 N.W.2d 642 (1984); *Ritter v. Ritter*, 234 Neb. 203, 450 N.W.2d 204 (1990). The trial court apparently split custody based on testimony concerning the bonding of the children and accepted the statements that Tyler had a better relationship with his father. The court stated that the split custody, which was initially a temporary order, appeared to be working. However, there is evidence of difficulties with visitation during the separation. James and Gardels both testified that Laurie and her mother insisted on searching the vehicle when they arrived to pick up Tyler. We have already noted the problems created by Laurie's placing conditions on visitation concerning the

grandparents. James also had difficulty in talking to the children on their birthdays and was apparently not always allowed to say hello to Jillian when he picked up Tyler.

We find that it is in the best interests of Tyler and Jillian that they be allowed to remain together in the custody of the parent most able to provide a stable, nurturing environment. That parent is James, and we reverse the district court's holding awarding split custody. We remand for the district court to revise the visitation schedule accordingly.

## CHILD SUPPORT

James also assigns as error the trial court's requirement that he pay $200 per month child support. Because we reverse the district court's order and award custody of both children to James, we also reverse the court's order regarding child support. Because the decree did not make clear how the child support determination was calculated, we remand to the district court to recalculate any possible child support based on the new custody award.

## PROPERTY DIVISION

Also assigned as error is the trial court's determination that the net marital estate was valued at $76,755. James asserts that the court abused its discretion by not taking into consideration and setting aside his 11-percent interest in the family farm corporation, Ziebarth Farms, Inc. We do not find the division of property to be an abuse of discretion, and the property division portion of the decree is affirmed.

## ATTORNEY FEES

The last assignment of error asserted by the appellant is the court's order that James pay $5,000 toward attorney fees for Laurie. " 'An award of an attorney fee in a marital dissolution proceeding is a matter within the trial court's discretion, is reviewed de novo on the record, and will be affirmed on appeal in the absence of abuse of discretion.' " *Huffman v. Huffman*, 236 Neb. 101, 109, 459 N.W.2d 215, 221 (1990). In awarding attorney fees in a dissolution action we consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time

required for preparation and presentation of the case, the novelty and difficulty of questions, and the customary charges for similar services. *Murrell v. Murrell*, 232 Neb. 247, 440 N.W.2d 237 (1989); *Hamm v. Hamm*, 228 Neb. 294, 422 N.W.2d 336 (1988). The trial court may also consider the earning capacity of the parties and the general equities of the situation. *Smith v. Smith*, 222 Neb. 752, 386 N.W.2d 873 (1986); *Kosnopfl v. Kosnopfl*, 206 Neb. 524, 293 N.W.2d 854 (1980).

At the time of the trial, Laurie was working only part time, earning about $1,300 per month. James' potential earning capacity from his farm is far greater, and we find that the attorney fee is reasonable in light of the time involved in preparing this case and the general equities. Although the trial court did not include in the record the basis for the award, we do not find that the court abused its discretion, and we affirm the award of an attorney fee.

## CROSS-APPEAL

We have dealt with the first assignment of error in the cross-appeal concerning custody. We next address the cross-appellant's argument that the trial court erred in failing to award her alimony. Laurie asks for $500 per month alimony for 120 months. On appeal, an alimony award will be reviewed de novo on the record and affirmed in the absence of an abuse of the trial judge's discretion. *Murrell, supra*. The ultimate test in determining the correctness in the amount of the alimony is the reasonableness in light of the facts of each case. *Murrell, supra*. The factors determining the reasonableness of an award of alimony include the duration of the marriage, the history of the contributions to the marriage by each party, the ability of the supported party to engage in gainful employment, and the income and earning capacity of each party, as well as the general equities of the situation. *Gale v. Gale*, 224 Neb. 803, 401 N.W.2d 501 (1987).

> In determining whether alimony should be awarded . . . [t]he trial court should consider what effect, if any, the marriage has had upon the ability of the supported spouse, if any, to secure employment in the future, and the

earning capacity of the supporting spouse. . . .

Alimony is not to be used simply to equalize the income of the parties or to punish one of the parties. It may be used to assist the other party during a reasonable time to bridge that period of unavailability for employment or during that period to get proper training for employment.

*Murrell, supra* at 252-53, 440 N.W.2d at 241; *Kimbrough v. Kimbrough*, 228 Neb. 358, 362, 422 N.W.2d 556 (1988).

The trial court found that Laurie did not interrupt a personal career or forgo educational opportunities. We agree. Laurie did not provide evidence to establish a disparity in the income or the potential income between the parties, nor is there evidence that the marriage had any effect upon her ability to obtain training or a job. In fact, the evidence indicates that she had many opportunities to complete her education, but that she failed to take advantage of or to follow through on those opportunities. Her failure to obtain certification in her chosen field of respiratory therapy is hers alone. She did not participate in the farming operation, and at the time of trial she was earning approximately $1,300 per month working part time at Phelps Memorial Health Center in Holdrege. We are not persuaded that the general equities of the situation require that she be awarded alimony. The trial court was correct in this determination, and the cross-appeal is dismissed.

## CONCLUSION

Although it is never an easy task to determine the custody of minor children in a dissolution action, we believe that the children in this instance must be given the opportunity to develop normally and to grow up in a stable, nurturing environment. We find that the father, James, is more able to provide this environment, and it is in the children's best interests to be placed with him. We reverse the finding of the district court dividing custody and remand for a determination of visitation. We also remand for a recalculation of child support. We affirm the court's property division and its award of an attorney fee, as well as the court's determination not to award alimony. The cross-appeal has no merit and it is dismissed.

REVERSED AND REMANDED WITH DIRECTIONS.