IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

SKALSKY V. SKALSKY

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

MELISSA M. SKALSKY, APPELLANT,

V.

JOHN J. SKALSKY, APPELLEE.

Filed August 30, 2016.    No. A-15-973.

Appeal from the District Court for Keith County: RICHARD A. BIRCH, Judge. Affirmed as modified.

Felicia K. Fair, of Fair Law Office, P.C., L.L.O., for appellant.

P. Stephen Potter for appellee.

MOORE, Chief Judge, and IRWIN and PIRTLE, Judges.

MOORE, Chief Judge.

## I. INTRODUCTION

Melissa M. Skalsky appeals from an order of the district court for Keith County dissolving her marriage to John J. Skalsky. On appeal, Melissa asserts that the district court erred in its award of custody, parenting time, child support, and the tax dependency exemptions for the children. Additionally, Melissa argues that the district court determined the outcome prior to hearing all the evidence, denying her a fair trial and just outcome. As discussed below, because we find that the district court erred in imposing a residential boundary as a condition on parenting time, we modify the parenting plan to eliminate this condition. Finding no abuse of discretion by the court in the remaining order, we affirm in all other respects.

- 1 -

## II. BACKGROUND

Melissa and John were married in 1995. Three children were born during the marriage; Saige in 1999, Hunter in 2002, and Ethan in 2005. The parties separated in September 2014 and Melissa filed her complaint for dissolution of marriage. Both Melissa and John, in their respective pleadings, requested to receive custody of their children.

### 1. TEMPORARY CUSTODY ORDER

On November 20, 2014, the district court entered a temporary order. The court found that the affidavits received in evidence established a level of animosity between the parties that makes joint temporary custody unworkable. John was awarded the temporary custody of the children. The court ordered that if the parties are unable to agree to terms of reasonable visitation, Melissa shall have alternating weekend visitation beginning on Wednesday at 5:00 p.m. and ending on Sunday at 5:00 p.m. The court also ordered John to pay Melissa $850 per month in temporary spousal support. This amount was reached by offsetting the lesser amount of child support owed by Melissa against John's greater temporary spousal support obligation.

### 2. TRIAL

Trial was held on June 24, 2015. Prior to trial, the parties entered into a stipulation regarding the division of their property and debts. Trial was held on the issues of custody, parenting time, child support and related issues, and alimony. The court first held in-camera interviews of the children in the presence of both parties' counsel.

### (a) Testimony of Saige

Saige was 15 years old and had just completed her high school freshman year. She prefers to live with John. Saige supported this preference by testifying that John is more laid back and understanding, and they have a really good relationship, which she does not have with Melissa. She claimed to not ever be in a good mood while at Melissa's residence, but the situation is different when at John's residence. However, Saige did recount an instance where, during an overnight stay with Melissa, she had a bad dream, went to Melissa for comfort, and ended up sleeping with her for the remainder of the night.

Saige expressed being comfortable with similar visitation as existed under the temporary order, visiting Melissa every other weekend, but including more time with John. She confirmed that such an arrangement would be beneficial to her schoolwork and activities. Saige indicated that each child has their own bedroom at John's residence. On the other hand, Saige testified that staying with Melissa, who lives in town, would make it easier to get places. Saige recognized that Melissa had been the primary caretaker prior to separation.

Saige testified that John is heavily involved in her soapbox derby activities, while Melissa was not present until the championship races. She acknowledged that Melissa serves on the derby board, but feels that Melissa is not actively involved in assisting her.

Saige runs a lawn mowing business to earn money. Hunter is also involved in this business. Saige also raises steers, goats, and pigs, which she in turn sells, applying the earnings to her college fund. These animals are kept at John's house.

Saige testified that John told her more details regarding events leading to the divorce than she preferred to know. Saige confirmed that, early in the divorce process, John would speak with her regarding his feelings, she understood that he was hurt, and this made her sad. Further, Saige agreed to feeling protective of John's hurt feelings at times.

Saige testified to being able to call and visit Melissa beyond visitation periods, and that John has never stopped her from doing so. Saige feels that John and Melissa both discipline her equally, and that John does not give her more freedom than Melissa provides. She also feels that it is very important the children stay together.

### (b) Testimony of Hunter

Hunter was 13 years old and had just finished the 8th grade. While expressing benefits of living with both Melissa and John respectively, Hunter preferred to reside with John. Regarding parenting time, Hunter confirmed that visitation every other weekend, with the option of seeing Melissa when he could, would be desirable. However, Hunter also indicated that alternating week long visitation could work, allowing equal time with both parents, but it would "probably be harder" during the school year.

Hunter's preference for living with John was based in part on being able to work with his animals for 4-H, opportunities for greater participation in soapbox derby activities, and there generally being a lot more to do at John's residence. He also noted that John's residence is bigger and not "all cramped."

Regarding benefits of residing with Melissa, Hunter gets to spend more time with his friends while at her home, and this house is closer to town and school. However, Hunter testified to occasionally fighting with Melissa if Ethan and he fail to pick up the house. Hunter agreed that Melissa traditionally provided for the daily needs of the children prior to separation.

Hunter confirmed perceiving John as being upset at Melissa. However, Hunter believed that John would allow him to visit Melissa in town outside of visitation time.

### (c) Testimony of Ethan

Ethan, did not express a clear desire to reside with either John or Melissa, wanting to spend time with both parents. Ethan testified that, while the siblings will fight among themselves, the children love each other.

Ethan acknowledged not getting along with John and Melissa on occasion. He would miss Melissa while with John. However, Ethan testified that when he misses Melissa, John consoles him, telling Ethan that Melissa and the whole family love him. Ethan acknowledged being aware of John's anger towards Melissa.

### (d) Court's Comments Following In-Camera Interviews

The following discussion occurred immediately after the in-camera interviews:

The Court: . . . Let's take a little break.

John's Attorney: Okay. And, Judge, I think we can read in the record -- I think we've got all the property issues resolved and --

The Court: I think we have most of our issues resolved personally.

John's attorney: I think so too.


(e) Testimony of John and Melissa

At the time of their marriage, John and Melissa lived in Laramie, Wyoming and were attending college. John graduated with a bachelor's degree in agricultural business and has been employed since then at various places as an agronomist. In 1997, the parties moved from Laramie to Curtis, Nebraska, for John's employment with a crop consulting company. In 2007, the family moved to Ogallala where John accepted employment with another company. John's most recent annual income was approximately $95,000. He has received annual performance bonuses since joining this most recent employer. John's employment commonly included extended work hours and travel.

Melissa did not finish college, however, she earned a nurse's aide certificate (CNA), and worked as a CNA in Laramie for approximately two years, until the couple moved. At this time, Melissa was earning $8 per hour.

By agreement of the parties, John was the primary financial supporter for the family while Melissa was the principal caretaker for the children throughout the marriage. Melissa's employment was mostly part-time, supplementing the household income. Upon the family's move to Ogallala, Melissa worked for the Ogallala Keith County Chamber of Commerce for 3½ years. She scheduled work hours with the Chamber to follow the children's school schedule, allowing her to be available to the children.

Melissa later earned a cosmetology certificate as a nail technician and started her own small business. Melissa has been self-employed as a nail technician part-time over the last several years. This self-employment arrangement has given her flexibility to plan work around the needs of the children. Melissa's 2014 receipts were $21,906, with expenses of $7,416, for taxable income of approximately $14,000.

Melissa admitted that there currently is a shortage of CNAs and a large demand. Melissa agreed she could presently earn at least $10 an hour working as a CNA. While her CNA license is expired, Melissa testified that she could renew it, but has not looked into this. Melissa admitted there is nothing preventing her from working full-time. Melissa chose to work part-time because it allows more time with the children. During the 9 months of separation, Melissa has worked more hours at the salon, while remaining part-time.

While Melissa handled the significant majority of parenting duties from the children's birth until the parties' separation, both parents have been involved in the lives of their children. Melissa's parenting activities included assisting the children with morning and evening routines; preparing meals; arranging medical appointments; transporting the children to and from daycare, school, and appointments; signing up the children for activities, which included sports, 4-H Club, and soapbox derby; helping with fundraising projects and events; disciplining the children; shopping for groceries and clothing; volunteering and coaching activities of the children; attending parent-teacher conferences; and taking care of the children when they were sick. Ethan has been

diagnosed with a hearing impairment, attention deficit hyperactivity disorder, and digestive and bowel problems. Melissa has historically been the primary parent to attend to Ethan's health issues.

John has attended and participated in the children's activities over the years. He helps the children prepare to show animals for 4-H and race in soapbox derbies. John did not regularly perform daily parenting tasks until the parties separated.

The marriage began to encounter significant difficulties and the parties started discussing divorce in 2013. Melissa became involved with another man, with whom she is developing a relationship. In January 2014, the parties together discussed their problems with Saige and Hunter. John later told Saige and Hunter that their mother had begun speaking with another man and that they were more than just friends.

The parties' efforts at reconciliation failed and in May 2014, Melissa began looking for a new residence. She moved out of the family home in early September 2014, on the recommendation of her therapist. Melissa made the decision to move out believing John was never going to leave the house and because she would not have been able to afford the marital residence.

Because Melissa was unable to find affordable rental housing in Ogallala, she began renting an apartment in nearby Paxton on a temporary basis until a suitable property became available in Ogallala. Melissa left the children with John at the marital residence; feeling it would be inappropriate to move the children to another town at that time, and because they were upset about the separation.

Melissa subsequently moved into a rental house in Ogallala, where she had resided for approximately 6½ months at the time of trial. The rental house has one bathroom, two bedrooms, and a yard. Melissa expressed a desire to purchase a home in Ogallala, but had not done so at the time of trial. The family home, where John continues to reside, is located five miles southwest of Ogallala. The children currently attend public school in Ogallala.

Shortly following separation, the parties communicated regularly. John and Melissa established shared parenting time, with Melissa having possession approximately six nights and John having possession eight nights out of every 14. This arrangement existed from the month of separation, September 2014, until John's award of temporary custody in November 2014.

Because of the disruption for the children caused by packing and changing residences midweek, making it difficult for Hunter to complete homework, John proposed that Melissa's visitation be limited to every other weekend. Moving forward, Melissa felt that joint custody would be best for the children. John in turn sought sole custody of the children.

During the separation period, John made several expensive purchases for the children. He bought a pickup truck for Saige, who was 14 years old at the time, for the purpose of driving to and from school. John had the truck professionally painted. He also purchased steers for Saige and Hunter as 4-H projects.

Melissa testified that prior to separation, Saige and John were always close, and that John had a good relationship with Hunter and Ethan. However, she claimed to have a closer relationship with Hunter and Ethan. Melissa stated that the children were generally good at following her directions and helping prior to separation. Melissa claims that her positive relationship with the children was negatively affected after John obtained temporary custody. She noticed changes in the children's attitudes and behavior.

Melissa indicated that Saige used to confide in her, and that they had a typical mother-daughter relationship. However, Saige became very distant and quiet, stopped speaking to Melissa even regarding little things, and would talk back. At one point, Melissa claims to have seen a text John sent to a third party, stating that Saige finally stood up to her mother.

Melissa also noticed Hunter developing a more defiant attitude towards her during part of the school year. She started receiving back-talk from Hunter, which had not occurred before the separation.

According to Melissa, Ethan, who had been the most defiant of the children prior to separation, became the most helpful. Ethan became more emotionally needy post separation, crying on various occasions. For example, Ethan wanted Melissa to join him for lunch at school more frequently, and would request additional time with her.

Melissa claims that during her extended summer parenting time, the children's relationship with her returned to normal and their interaction was positive.

Melissa testified to various actions by John during the temporary period, including his refusal to allow her to transport the children when he was unavailable, and his refusal of her requests for additional parenting time.

In contrast, Melissa claimed to be flexible regarding parenting time. For example, she supported a 2-week trip by Saige despite its partial interference with her summer parenting time. Melissa sacrificed a couple hours of visitation to allow the children to work on a soapbox derby fundraiser. Melissa also agreed to cut short her Easter holiday visitation by a couple hours so John and the children could work with the 4-H animals.

Melissa testified regarding John's failure to coordinate Ethan's doctor appointments. Melissa historically coordinated Ethan's appointments with an audiologist and pediatrician, both located in Kearney, so he could visit these doctors in one trip. However, since assuming custody, John failed to coordinate appointments, only scheduling an appointment with the pediatrician. Melissa ended up scheduling the audiologist appointment, because the school needed a current audiology report.

John testified that he was angry and hurt when Melissa first left, but claims to have worked through it for the sake of the children. Specifically, John stated that the children "know what has happened" and "know I'm okay with it." He admits that the period of initial separation "was an emotional time for all of us."

Following the award of temporary custody, John made changes in his job to allow for greater flexibility. This was facilitated in part by company restructuring and consolidation, so he no longer is required to travel as frequently. John has taken on the role of primary caretaker for the children, including cooking, laundry, cleaning the house, and transporting the children to and from school events. Shortly following separation, John met with every school counselor to discuss the situation, in case the children had issues at school. John also visited the school several times to address the children's grade decreases.

John believes it is important for the children to maintain a close relationship with Melissa, and for her to be involved in their lives. John denied using custody as a weapon against Melissa. He did not restrict the children's telephone contact with Melissa to the times contained in the temporary order. Rather, he felt they should be able to speak with Melissa throughout the week.

John testified to having a close relationship with the children, both before and after separation. He participates in Saige's 4-H projects as well as her soapbox racing activities. Similarly, John and Hunter have attended stock car races, gone hunting, and visited town together. John supports Hunter's involvement in sports, 4-H, and soapbox derby. John testified that Ethan loves him and Melissa equally.

John testified that he attended the children's parent-teacher conferences, sporting events, and was involved in their 4-H and soapbox racing activities from start to finish, while Melissa typically was present only at the end of races or when the children showed animals. John occasionally missed the children's activities as the result of work conflicts.

John testified that since the grant of temporary custody he has "developed a very close relationship" with the children, and that the children "feel like they can come talk to (him) about anything and not be embarrassed about it." On cross-examination, John confirmed discussing the parties' separation with each of the children, speaking to Saige more than the others.

(f) Testimony of Other Witnesses

Dr. Lucas McConnell, a licensed psychologist whose practice focuses on families and children, testified on behalf of Melissa as an expert regarding the effects parental attitudes and behaviors have upon children during divorce, specifically regarding the negative effects placed upon children by a "high-conflict divorce" and "parental alienation."

McConnell had not met either parent or the children involved in the present case, and he had not reviewed any material pertaining to the case. He was unaware if the present case involved a "high conflict" divorce. Nevertheless, McConnell described several harmful behaviors by a parent that can be detrimental to children and lead to alienation of the other parent. These harmful behaviors include encouraging a child to keep secrets from the other parent, buying expensive items for the children after separation, and talking with the children regarding the harm imposed upon him or her by the other parent. Melissa claims that John engaged in each of these types of behavior with one or more of the children.

Carol Packard, a physician assistant, has been the primary medical care provider for the three children since the family moved to Ogallala in 2007. She testified that it was Melissa who accompanied the children when they visited the clinic for treatment of various illnesses over the years. Packard did not recall seeing John at the children's medical appointments until after the separation. Packard had no concerns regarding either parent's ability to care for the children.

Following separation, Saige had an appointment with Packard concerning an ongoing stomach problem. Saige was not diagnosed with any specific physical condition, but stress was identified as a potential cause.

Other witnesses called by Melissa included a prior daycare provider for Ethan whose son is friends with Ethan, a friend of Melissa, the owner of the salon where Melissa works, and the retired principal of the elementary school attended by the children.

Melissa's witnesses generally testified regarding her active involvement with the children's various activities, observations of the children's behaviors and attitudes, and the children's positive relationship with their mother. These witnesses described Melissa as a good, concerned, and responsible parent who gave priority to the needs of her children. The children were described as

well-behaved and respectful. Their testimony confirmed that Melissa handled a significant majority of parenting duties prior to separation, and she adjusted her work schedule to accommodate the children's needs. However, some of these witnesses also confirmed that John was an involved parent. John did not present any witness testimony beyond his own.

### 3. CONCLUSION OF HEARING

Following closing arguments, the court made the following comment:

[A]fter having listened to the evidence today, having spoken with the kids this morning of the parties, there's no doubt in my mind that both parents love these kids very much, there's no doubt in my mind that these kids love both of the parents very much, there's no doubt in my mind that both of the parents are fit and capable of taking care of these children, and I agree that we need to figure out a way that these children can have as good a relationship as possible with both parents, and that's what I'm going to be working towards and whatever the decision is in the best interest of these children.

The hearing subsequently concluded with the court taking the matter under advisement.

### 4. DECREE OF DISSOLUTION

On August 6, 2015, the court entered its memorandum opinion and decree of dissolution. The court found as follows regarding custody of the children:

It is clear from the evidence that each party is a fit parent, loves their children, and is loved by their children. That evidence also establishes that joint custody is not an option. After reviewing the evidence, including testimony of the older two children, the Court finds that it is in the best interest of the children that the permanent care, custody and control of the minor children . . . be awarded to (John) subject to the right of reasonable visitation and parenting time in (Melissa) as shown in the Parenting Plan . . . .

The court-created parenting plan provided parenting time with Melissa every other week from Thursday to Sunday. However, the plan also specified that if Melissa resides beyond 10 miles of the Ogallala Public School District boundaries, her weekend visitation will be reduced to every other weekend from Friday to Sunday. The plan also established holiday parenting time for spring/Easter vacation, Thanksgiving, Christmas, New Year's, Mother's Day, and Father's Day, along with summer.

The decree ordered Melissa to pay child support in an amount of $230 per month for three children, $230 per month for two children, and $224 per month for one child. The attached child support worksheets attributed to Melissa a total monthly income of $1,387, and to John of $7,937. Melissa's share of child support for three children is $370, but the court reduced this amount to $230 due to § 4-218 of the Nebraska Child Support Guidelines (the poverty provision). While there was no mention of the child dependency tax exemption within the decree, the child support worksheets designated that John would receive the exemption for all three children. The decree awarded Melissa alimony in the amount of $950 per month for a period of 60 months and then

$600 per month for an additional 48 months. Within the decree, it was noted that Melissa is currently working part-time but is capable of working full-time.

## 5. MOTION FOR NEW TRIAL

On August 12, 2015, Melissa filed a motion for new trial, requesting in part a reexamination of the parenting time schedule. On September 18, a hearing was held addressing the motion for new trial. On September 24, the court entered an order overruling Melissa's motion.

Melissa subsequently perfected this appeal.

## III. ASSIGNMENTS OF ERROR

Melissa assigns, summarized, restated, and reordered, that the district court erred in (1) making its decision prior to hearing all the evidence; (2) awarding custody to John; (3) establishing a parenting plan that does not serve the best interests of the children, in that it fails to include certain holidays, reduces Melissa's parenting time under the temporary order, and requires Melissa to live within a certain distance of the children's school district; (4) awarding the child dependency tax exemption to John; and (5) calculating Melissa's child support obligation.

## IV. STANDARD OF REVIEW

Child custody and visitation determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

An appellate court also reviews a trial court's determinations on matters such as child support and the child dependency exemption de novo on the record to determine whether the trial judge abused his or her discretion. See *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015).

In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions with respect to the matters at issue. However, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015); *Cesar C. v. Alicia L.*, 281 Neb. 979, 800 N.W.2d 249 (2011).

An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). A judicial abuse of discretion requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result. *Id*.

## V. ANALYSIS

### 1. PREMATURE DETERMINATION BY COURT

Melissa asserts that the court wrongly reached its decision on custody prior to hearing all the evidence, thus depriving her of a fair trial and just result. In support of this argument, Melissa

cites to the court's statement following the interviews of the children that "I think we have most of our issues resolved personally."

Upon our review, we find Melissa's argument to be without merit. When viewed in its totality, the record is clear that the court had not reached its decision regarding custody after hearing only the children's testimony. This is evident by the court's statements at the end of trial, demonstrating a desire to consider all the evidence, including the testimony of the children, in making a decision based upon the best interests of the children. There was substantial evidence presented at trial concerning the issues of custody and parenting time and it cannot be said from the record that this evidence was not fully considered by the trial court. Melissa's first assignment of error is without merit.

## 2. CUSTODY AND PARENTING TIME

Melissa argues that the court abused its discretion in awarding custody of the minor children to John. Melissa also contends that the parenting plan established by the court does not serve the best interests of the children. Specifically, Melissa contends that the court erred by failing to include certain holidays in the plan, reducing her parenting time from that contained in the temporary order, and requiring her to live within a certain distance of the school district to retain regular visitation.

The Nebraska Parenting Act recognizes that the best interests of children require a parenting arrangement and parenting plan which provides for a child's safety, emotional growth, health, stability and physical care and regular and continuous school attendance and progress. Neb. Rev. Stat. § 43-2923(1) (Cum. Supp. 2014). The Act sets forth a non-exhaustive list of factors to be considered in determining the best interests of a child in regards to custody and parenting arrangements. Such factors include the relationship of the minor child with each parent, the desires of the minor child, the general health and wellbeing of the minor child, and credible evidence of abuse. Neb. Rev. Stat. § 43-2923(6) (Cum. Supp. 2014).

In addition to the "best interests" factors listed in Neb. Rev. Stat. § 43-2923, a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

Specifically regarding the desires of a minor child, the Act provides that the court should consider "the desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning." Neb. Rev. Stat. § 43-2923(6)(b). The Nebraska Supreme Court in applying this provision has stated that while the wishes of a child are not controlling in the determination of custody, if a child is of sufficient age and has expressed an intelligent preference, the child's preference is entitled to consideration. *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002). See, also, *Adams v. Adams*, 13 Neb. App. 276, 691 N.W.2d 541 (2005). The Supreme Court has also found that in cases where the minor

child's preference was given significant consideration, the child was usually over 10 years of age. *Vogel v. Vogel*, 262 Neb. 1030, 1046, 637 N.W.2d 611, 624 (2002).

The Nebraska Supreme Court has also held that courts should determine "the nature and extent of visitation rights on a case-by-case basis" and may consider many factors and circumstances in each individual case, such as:

> the age and health of the child; the character of the noncustodial parent; the place where visitation rights will be exercised; the frequency and duration of visits; the emotional relationship between the visiting parent and the child; the likely effect of visitation on the child; the availability of the child for visitation; the likelihood of disrupting an established lifestyle otherwise beneficial to the child; and, when appropriate, the wishes of the child.

*Fine v. Fine*, 261 Neb. 836, 843, 626 N.W.2d 526, 532 (2001).

While the Parenting Act recognizes the importance of both parents remaining active and involved in parenting in order to serve the best interests of the child, the statutes do not require the district court to grant equal parenting time or joint custody to the parents if such is not in the child's best interests. See Neb. Rev. Stat. § 43-2923(3) (Cum. Supp. 2014); *Kamal v. Imroz*, 277 Neb. 116, 759 N.W.2d 914 (2009); *Klimek v. Klimek*, 18 Neb. App. 82, 775 N.W.2d 444 (2009) (court did not abuse its discretion in failing to find joint custody was in best interests of minor children when the parties had difficulty communicating with each other).

(a) Custody

Melissa argues that the court erred in awarding sole custody of the children to John.

Upon our de novo review, we find that the court did not abuse its discretion in awarding sole custody of the children to John. The record clearly reflects that both parents are fit and loving parents. The children are well-adjusted, active, and healthy as a result of the efforts of both parents. Both parents have shown concern for Ethan's special needs. We recognize that Melissa has historically been the primary caretaker for the children and has done an excellent job. However, John has also been very involved in the children's lives and since the separation, has been their primary caretaker.

The separation and divorce has caused the children some stress as is not unusual, according to McConnell. Melissa's extramarital relationship and John's reaction was discussed with the children and may have contributed to some of the difficulty that the children experienced, especially Saige. Nevertheless, both parents have made efforts to assist the children through this process. Despite the strained relationship between John and Melissa, they have been able to work out most of the logistics necessary to create a fairly smooth transition for the children and tend to their daily needs.

The desires and wishes of the children were given consideration by the court. The record indicates that Saige and Hunter's desire to reside with John was based on sound reasoning. Both children explained their preference, citing to benefits of residing in the family home, greater opportunities to be involved in extracurricular activities, and a positive relationship with John. The court had an opportunity to weigh Melissa's claim that the truck and steers were purchased as bribes against John's argument that these were bought for the purpose of transportation and

promoting extracurricular involvement. Where evidence is in conflict, this court gives weight to the circumstances that the lower court heard and observed the witnesses, accepting one version of the facts over another. The court did not err in giving weight to the children's preferences based on their testimony and the evidence before it. Further, while Ethan did not give a preference, the court acted in accordance with the children's best interests by placing them together with one parent. See, *Ziebarth v. Ziebarth*, 238 Neb. 545, 471 N.W.2d 450 (1991); *Kay v. Ludwig*, 12 Neb. App. 868, 686 N.W.2d 619 (2004). In addition, it is clear that the children are comfortable in the family home with John where they can continue to participate in their livestock activities.

While the evidence would also have supported a grant of custody to Melissa, the court's decision to award custody to John was well supported by the record and did not amount to an abuse of discretion.

Melissa's second assignment of error is without merit.

### (b) Omitted Holidays

Melissa asserts that the court erred in failing to include Memorial Day, Labor Day, and Independence Day in the parenting plan.

Upon our de novo review, we find that the court did not abuse its discretion in failing to establish parenting time arrangements for these holidays. There is no requirement contained in the parenting plan statutes that these particular holidays be contained in the parenting plan. We recognize that John had no objection to including these holidays in the parenting plan. Taking into consideration that the parenting plan does not limit Melissa's parenting time to only those times specified therein, the close geographic proximity of the parties, and John's professed willingness to provide parenting time to Melissa beyond that specified in the plan, we will not disturb the court's parenting plan.

Melissa's third assignment of error is without merit.

### (c) Weekend Parenting Time

Melissa argues that the court erred in reducing her parenting time, from every other Wednesday through Sunday under the temporary order, to every other Thursday through Sunday.

Upon our de novo review, we cannot find an abuse of discretion in the decrease of Melissa's weekend parenting time by one day from that contained in the temporary order. The children indicated a desire to reside and spend more time with John. John has indicated a willingness to allow the children to communicate and spend time with Melissa outside of formal parenting time. The record and best interests of the children support the court's award of parenting time, and such an arrangement was not an abuse of discretion.

Melissa's fourth assignment of error is without merit.

### (d) Residential Boundaries

Melissa argues that the automatic reduction in parenting time upon moving beyond 10 miles of the Ogallala Public School boundaries amounts to "an improper predetermination of what would be a material and substantial change of circumstances," and therefore is an abuse of discretion. She asserts that moving slightly farther than 10 miles from the boundary would create

no obvious hindrance to the exercise of parenting time, and that it is not uncommon for Ogallala students in rural Keith County to live beyond this boundary. We note that this provision was not addressed by the parties or court during the trial.

Upon our de novo review, we find that the court abused its discretion in placing the residential condition on Melissa's parenting time. No evidence was adduced to support a need at this time to automatically reduce Melissa's parenting time should she move more than 10 miles from the school boundaries. While the Nebraska Parenting Act recognizes that the best interests of children are promoted through a parenting plan which provides for regular and continuous school attendance and progress, the use of an arbitrary 10-mile boundary to prospectively reduce parenting time appears unnecessary. There is nothing in the record which would suggest that Melissa living beyond 10 miles of the school district would harm the children's education, particularly in a rural area such as Keith County. If Melissa later moves farther away from the school district, there is nothing to prohibit the parties and court from re-examining the parenting plan under the particular circumstances then in existence. We modify the parenting plan to remove this portion of the order.

### 3. TAX DEPENDENCY EXEMPTIONS

Melissa asserts that the court erred in implicitly awarding the tax dependency exemption for all three children to John. While the decree did not specifically address the exemptions, the child support worksheet attached to the decree calculated support by giving John all three exemptions for the children.

Under Nebraska law, a state court having jurisdiction in a dissolution action has the power to allocate tax dependency exemptions as part of the dissolution decree. *Kalkowski v. Kalkowski*, 258 Neb. 1035, 607 N.W.2d 517 (2000). A tax dependency exemption is nearly identical in nature to an award of child support or alimony. *Emery v. Moffett*, 269 Neb. 867, 697 N.W.2d 249 (2005). In general, the custodial parent is presumptively entitled to the federal tax exemption for a dependent child. *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015). A court may exercise its equitable powers and order the custodial parent to execute a waiver of his or her right to claim the tax exemption for a dependent child if the situation of the parties so requires. *Id.* However, allocation of the dependency exemption to the noncustodial parent is not warranted if the parent pays a relatively small amount of child support. *Id.*

Melissa argues that under the temporary custody order, the court assigned one child to Melissa as a dependent. However, there is nothing in the record to support this assertion. Melissa argues that because she is paying child support, she should be entitled to at least one exemption. John, on the other hand, asserts that Melissa did not ask to receive one of the exemptions while he expressly requested the award of all of the exemptions within his cross-claim.

Upon our de novo review, we find that the court did not abuse its discretion in granting the tax dependency exemptions to John. As the custodial parent, John is presumptively entitled to the exemptions. Further, Melissa is paying fairly minimal child support; $230 for three children after a reduction from $370 under the worksheet calculation based upon the poverty guidelines. See, *Anderson v. Anderson, supra*. John's gross monthly income was determined to be $7,937, compared to the imputed income for Melissa of $1,387, and John's share of the support obligation

is $1,742. Under these circumstances, the trial court's implicit allocation of all three exemptions to John was not an abuse of discretion.

Melissa's sixth assignment of error is without merit.

### 4. CHILD SUPPORT OBLIGATION

Melissa argues that the court erred in calculating her child support obligation.

The paramount concern in child support cases is the best interests of the child. *Incontro v. Jacobs*, 277 Neb. 275, 761 N.W.2d 551 (2009). In general, child support payments should be set according to the Nebraska Child Support Guidelines adopted by the Nebraska Supreme Court, which are presumed to be in the best interests of the child. *Id*. See, also, Neb. Rev. Stat. § 42-364.16 (Reissue 2008); *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015). In determining the amount of a child support award, a trial court must consider the status, character, and situation of the parties and attendant circumstances, including the financial condition of the parties and the estimated cost of support of the children. *Anderson v. Anderson, supra*.

The Guidelines provide that in calculating child support, a court must consider a party's total monthly income derived from all sources. See Neb. Ct. R. § 4-204. See, also, *State on behalf of A.E. v. Buckhalter*, 273 Neb. 443, 730 N.W.2d 340 (2007). However, under the Guidelines, earning capacity may be considered in lieu of a parent's actual, present income and may include factors such as work history, education, occupational skills, and job opportunities. *Claborn v. Claborn*, 267 Neb. 201, 673 N.W.2d 533 (2004). See, also, *Incontro, supra*. Earning capacity may be used as a basis for an initial determination of child support under the Guidelines where evidence is presented that the parent is capable of realizing such capacity through reasonable effort. *Claborn, supra*.

Melissa argues that the court improperly determined she was capable of working full-time at minimum wage, imputing this level of income in calculating her child support obligation. Alternatively, assuming the court correctly imputed a higher income to Melissa, she argues it was an abuse of discretion for the court to label her as "not self employed" within the child support calculation worksheets, which she maintains has the effect of increasing her child support obligation.

Upon our de novo review, we find that the district court did not abuse its discretion in using earning capacity to determine Melissa's income. While Melissa has historically worked part-time in order to care for the children, John will now assume the role as the children's custodial parent. Melissa agreed that she is capable of working full-time. She also testified that CNAs are in great demand and she believed that upon renewing her certificate, she could earn $10 per hour in this capacity. The court appeared to impute earning capacity of $8 per hour for 40 hours per week in arriving at Melissa's gross monthly income of $1,387. This decision was supported by the record, including Melissa's work history, education, and occupational skills. There was also clear evidence presented, including Melissa's own testimony, that she is capable of realizing such capacity through reasonable effort.

We further find no error in the court's use of "not self employed" in its imputation of income to Melissa. Because the court was basing Melissa's child support obligation on earning

capacity pursuant to a full-time, minimum wage job, it was not wrong to label her as "not self-employed" on these worksheets.

Finally, Melissa's actual child support obligation after this imputation of earning capacity was reduced from $370 to $230 due to the limitation in § 4-218 of the guidelines. It is unlikely that using Melissa's actual income as opposed to earning capacity or designating her as self-employed would have materially changed the ultimate result.

Melissa's final assignment of error is without merit.

## VI. CONCLUSION

Upon our de novo review, we find that the district court erred in imposing a residential boundary as a condition on parenting time and we modify the parenting plan to eliminate this condition. All other provisions of the decree of dissolution are affirmed.

AFFIRMED AS MODIFIED.