SARA A. KAY, APPELLANT AND CROSS-APPELLEE, V.
DANIEL P. LUDWIG, APPELLEE AND CROSS-APPELLANT.
686 N.W.2d 619

Filed September 21, 2004.    No. A-03-1232.

John W. Ballew, Jr., of Ballew, Schneider & Covalt, P.C., L.L.O., for appellant.

Glen Th. Parks and Peter C. Wegman, of Rembolt, Ludtke & Berger, L.L.P., for appellee.

INBODY, MOORE, and CASSEL, Judges.

CASSEL, Judge.

## INTRODUCTION

Sara A. Kay appeals and Daniel P. Ludwig cross-appeals from the child custody provisions of the decree dissolving their marriage, which provisions granted the parties joint legal custody and awarded physical custody to Sara. Because we conclude that Neb. Rev. Stat. § 42-364 (Reissue 1998), which incorporates the 1993 amendment pertinent hereto, authorizes joint custody without parental agreement and that the district court did not abuse its discretion in the custody determinations, we affirm.

## BACKGROUND

The parties married on July 29, 1995. One child, Matthew Wallace Ludwig, was born to the parties on November 10, 1999. Sara filed her petition for dissolution on August 22, 2002, and Daniel moved out of the marital home in September. Daniel filed an answer and counterclaim on September 26. The court conducted a trial on July 21 and 22, 2003. On July 24, the court received additional evidence consisting of a trial deposition and heard closing arguments. By a decree entered October 1, the court dissolved the parties' marriage. The court found that both parties were fit and proper persons to have care, custody, and control of Matthew and that despite the failure of the parties to agree on the

matter, the best interests of Matthew required that the parties share joint legal custody, with Sara being granted primary physical custody. Attachments to the decree set forth Daniel's parenting time in addition to the parties' parenting responsibilities and requirements for cooperation.

Because the assignments on appeal concern only child custody determinations, we now summarize the evidence pertaining to those issues only.

*Employment.*

At the time of trial, Sara had worked for 2 years as executive director of the American Institute of Architects, her "dream job." Sara was not planning to change her employment. Sara normally worked from 9 a.m. to 5 or 5:30 p.m. and considered her schedule to be "[v]ery flexible." Matthew usually attended daycare while Sara worked. Sara usually traveled for her job approximately four times a year.

Daniel graduated from the University of Nebraska-Lincoln in 1990 with a bachelor of science degree in natural resources and a minor in biology. In 1997, he obtained from the University of Nebraska-Lincoln a master of science degree in forestry, fisheries and wildlife, and water resources planning and management, earning a 3.8 grade point average on a 4.0 scale. In 2001, he obtained from Doane College in Lincoln a master of arts degree in administration, earning a 3.9 grade point average on a 4.0 scale. Daniel testified that he had obtained his master's degrees during the time he was having mental health issues.

Sara asserted in an affidavit that Daniel had been unemployed for 18 months at one point during the marriage. According to Daniel, during those 18 months he held a series of part-time jobs while obtaining his second master's degree. Daniel testified that he did business development for a consulting firm, worked as an interim career specialist, reorganized the University of Nebraska Environmental Resources Center, and applied for grants for that organization.

Daniel testified that at the time of trial, he was employed by Resource Management Associates, his own consulting firm. He provided consulting services regarding natural resources management at Army National Guard training sites in Nebraska and

managed the natural resources on 6,000 acres located approximately 40 to 45 minutes from his residence. He typically left for work at 7 a.m. and arrived home shortly after 5 p.m., and he carried a cellular telephone with him at all times. His employment was flexible enough to work around any issues that arose with daycare and sick children. At the time of trial, Daniel had not obtained a new contract for the next fiscal year, but he was anticipating obtaining a contract shortly after the trial. Daniel planned to remain in the Lincoln area to be near Matthew and Dillon Ludwig, Daniel's then 10-year-old son from a previous marriage.

*Relationship With Each Parent.*

Daniel testified that he and Matthew had a very close relationship and that they had grown closer during the year preceding trial, despite not having seen each other as frequently. Daniel described Matthew as a wonderful little boy with lots of energy, humor, and charisma, who is pleasant to be around. Daniel testified that he and Daniel do many things together, such as playing at the playground, going to the library, swimming, playing ball, playing computer games, hunting mushrooms, reading, and fishing. They had gone to the county fair, to the zoo, to museums, to see the Harlem Globetrotters, and on a train ride. Daniel had attended activities at Matthew's daycare center, such as the school picnic, the Fourth of July parade, and the Christmas program, and Daniel had also participated in parent-teacher conferences. Sara acknowledged that Daniel and Matthew have a good and positive relationship.

Sara testified that she and Matthew had shared a "very close bond." When they were at home, Matthew frequently followed Sara around the house. Sara described Matthew as a very happy child who loves trains, cars, trucks, reading, going to the library, and writing his name. They had gone together to the children's museum, the zoo, and the library.

*Environment Offered by Each Parent.*

Matthew had resided in the same house since his birth. Sara described the house as comfortable and fairly large, with four bedrooms, four bathrooms, and a fenced yard. The house was surrounded by "wonderful neighbors" and was located across

the street from an elementary school. Sara related that Matthew had friends in the neighborhood. She admitted that the house was larger than necessary, but she maintained that she planned to stay in the house because she believes consistency is important for Matthew.

Sara had traveled occasionally for her job and had hired babysitters to stay with Matthew at Sara's house during her absences.

Daniel testified that his apartment was located 4 miles from Sara's house. The apartment had two bedrooms, one for Daniel and one with bunk beds shared by Matthew and Dillon. Although Daniel attached some importance for a 3½-year-old child to live in a house rather than an apartment, he denied that it was a matter of great importance. Daniel asserted that Matthew had no friends his own age in Sara's neighborhood.

*Other Relationships.*

Daniel testified that for roughly the first 3 years of Matthew's life, Matthew lived with Daniel, Sara, and Dillon. Daniel characterized the relationship between Matthew and Dillon as close and still developing as the boys got older. Matthew and Dillon played together, read books together, and swam together. Matthew also attended Dillon's sporting events. Daniel believed that it is in Matthew's best interests to foster the close relationship between Matthew and Dillon in order to enable the boys to relate better in the future. Daniel described Dillon as an important role model for Matthew. According to Daniel, the separation had been difficult for both Matthew and Dillon; Matthew asked where Dillon was and Dillon asked the same about Matthew.

Sara agreed that Matthew and Dillon had a positive relationship but claimed that they had separate interests and did not play together very much. Sara denied trying to distance Matthew from Dillon after the separation and claimed that on occasion, she had invited Dillon to her house to play with Matthew.

Dionne Marie Mason, Dillon's mother and Daniel's former wife, testified that Dillon cared very much for Matthew and often talked about him. Dillon often shared details about Matthew and sometimes spoke to Matthew on the telephone. Mason claimed that being separated from Matthew had been difficult for Dillon.

Sara admitted that she had been dating a man who lives in San Francisco, California. Sara had seen him several times after her

separation from Daniel. Sara testified that if she received custody of Matthew, she would not apply to relocate to San Francisco with Matthew. Sara testified that her relationship with this man is in its infancy, that her job and family are in Nebraska, and that she is established with commitments in Nebraska. Sara asserted that Matthew, rather than her relationship with this man, is her top priority. Sara had introduced the man to Matthew as her "friend." She defended having introduced him to Matthew a few weeks after Daniel had moved out, and she denied worrying about Matthew's becoming confused. On two occasions, the man had stayed overnight in the basement of Sara's house. Sara admitted that in hindsight, to avoid confusion on Matthew's part, she should not have allowed the man to stay at her house.

Daniel testified that he has a female friend who lives in the same apartment complex. He denied any romantic involvement but admitted that the woman had been at his apartment approximately 40 times while Matthew had also been present.

*Attitude and Cooperation.*

Sara denied trying to distance Matthew from Daniel after the separation. Sara testified that she has never degraded Daniel in front of Matthew or shared with Matthew the difficulties that have occurred between herself and Daniel. She claimed that Matthew has always been available for visitation and that Daniel received extra time with Matthew at Christmas and in the spring preceding trial. Sara recognized the importance of Matthew's seeing Daniel and intended to foster that relationship. She hoped to maintain a friendly relationship with Daniel after the divorce and expressed a willingness to surpass court-mandated visitation. Sara testified that depending on the situation, she would agree to give Daniel additional parenting time if Daniel consistently complied with his medication and exhibited more rational behavior. Sara stated that the communication between herself and Daniel had been nearly nonexistent and that they have had a number of confrontations since the separation.

Sara admitted that she had stated in a deposition that enhancing the relationship between Matthew and Daniel was not her responsibility. At trial, Sara qualified that testimony by stating that when Daniel and Matthew are together, enhancing the relationship is Daniel's responsibility.

Mason, Daniel's previous wife and Dillon's mother, testified that she and Daniel communicate often—varying from several times a day to once or twice a week—to coordinate schedules and accommodate parenting time for each other. She stated that Daniel had been very flexible and very cooperative. Mason believed that their mutual cooperation and flexibility had made things easier for Dillon, that Dillon and Daniel had a strong relationship, and that they adored each other.

Daniel testified that he and Mason use a detailed schedule to maintain consistency for Dillon in each of their homes. He related that he and Mason speak at least a couple of times each week to coordinate their schedules with respect to Dillon. Daniel described his relationship with Mason as flexible, accommodating, and cooperative, and he believed that Dillon appreciated this relationship. Daniel asserted that his relationship with Mason demonstrated that he can and would develop a similar relationship with Sara, but he expressed concern that the same flexibility, cooperation, and accommodation would not occur if Sara was awarded custody of Matthew. Daniel stated that if he had custody of Matthew, Matthew would see Sara often. Daniel expressed the intention to act fairly and to provide liberal visitation.

Daniel testified that in November 2002, Sara left on a trip and obtained a babysitter to watch Matthew. Daniel was disappointed and upset that Sara had not asked him to watch Matthew. After Sara returned, Daniel told her that he wanted to watch Matthew when she was gone rather than having a babysitter come into Sara's house. According to Daniel, Sara responded that she felt it was her responsibility to provide Matthew's daycare. Later, Sara took other trips, and each time, Daniel had similar conversations with her. Daniel testified that he had communicated with Sara about the matter approximately a dozen times. Sara had continued to employ babysitters when she was gone, and Daniel testified that this caused him to believe she would not be flexible or cooperate in the future.

Sara admitted that Daniel had spoken to her in general terms about wanting to watch Matthew when she went out of town. Sara felt it had been important for Matthew to remain at home on these occasions. She claimed that Matthew had spent about one-half of

those times with Daniel because the trips had coincided with Daniel's visitations.

At the time of trial, Sara planned to go to Florida with Matthew and the man from San Francisco whom she was dating. Sara also planned to take a trip to Connecticut with Matthew and her sister during the summer following trial.

Sara testified that she had informed Daniel that she and Matthew would be taking two short out-of-state trips. Sara claimed that she had informed Daniel where they would be going, but had not disclosed the other persons with whom they would be traveling or the purposes of the trips. Sara described that she was frightened by Daniel's inquiries about purposes, fellow travelers, and destinations, and she characterized the questions as harassment and as "berating" and "belittling" her. Sara testified that she would be comfortable with Daniel's traveling out-of-state with Matthew without providing her with similar information. She testified that she considers Daniel's time with Matthew "his time" and "none of [her] business." However, Sara denied being comfortable with Daniel's parenting skills.

Daniel testified that Sara identified the city in Florida to which she and Matthew were going to travel but that she refused to provide additional information. Daniel had asked for the same information regarding the trip to Connecticut, and again Sara had declined to disclose it. According to Daniel, Sara told him that she would not disclose the information about her trips because it was none of Daniel's business and because their lives were separate. Daniel had eventually obtained information about the trips through Sara's attorney. Daniel testified that if he were leaving the state with Matthew, he would provide Sara with an itinerary, a telephone number where he could be reached, and the names of other travelers.

*Mental Health Issues and Stability.*

The parties presented conflicting testimony regarding the extent of Daniel's experiences with depression, the depression's effects upon him during the experiences, his conduct in "self-medicating," and his ability to function as a husband and parent during those times. In the spring of 2002, Daniel had consulted Dr. Robert Arias, a neuropsychologist. Arias initially met with

Daniel on two occasions; diagnosed him with an attention deficit disorder, an anxiety disorder, a recurrent major depressive disorder, and a dysthymic disorder; and developed a treatment plan consisting of psychotherapy. Daniel had attended psychotherapy, first on a weekly basis for 6 or 7 months and later on an every-other-week schedule. Daniel's mood and anxiety level had greatly improved since he started treatment with Arias; Daniel had been feeling freer, happier, and more positive about life. Daniel testified that none of his conditions impaired his ability to parent. Daniel had also been diagnosed with sleep apnea, a condition which causes him to awaken over 200 times a night, but he had decided that after the trial, he would have surgery to correct the condition.

Arias opined that individuals with Daniel's attention deficit disorder can be good parents and that although the disorder might cause Daniel frustrations in disorganized situations, Arias did not think the disorder would impair Daniel's ability to perform a parent's responsibilities. Arias stated that none of Daniel's other disorders or conditions would significantly adversely affect his ability to parent. Arias denied seeing any symptoms of a major depressive disorder in Daniel since July 2002. Daniel had attended his therapy sessions regularly and had put thought and effort into those sessions. Arias noted significant progress in Daniel's mood and anxiety. Arias did not see anything in Daniel that would indicate he would be dangerous or violent.

Mason testified she believes that Daniel is a good parent and that Dillon is safe when he is with Daniel. Mason opined that Daniel is a rational and functioning person who is not dangerous.

Sara had experienced some physical problems and some minor anxiety, but she denied any continuing experience with those issues.

The court received the deposition of a psychotherapist who testified regarding her contacts with Sara prior to the marriage, with both Sara and Daniel after the marriage, and with Sara only most recently.

Janice Kuhn, a psychotherapist and psychiatric nurse practitioner, stated in a deposition that she first saw Sara on July 23, 2002. Sara had spoken to Kuhn about difficulties in her marriage, and Kuhn had diagnosed Sara with some mild insomnia and a

mild level of dysthymia. Although Kuhn had recommended mild antidepressant therapy, Sara opted not to take antidepressants because her depression was situational. Kuhn opined that Sara did "beautifully" without the antidepressants. Kuhn had never been concerned about Sara's ability to effectively perform her parental responsibilities.

Sara testified that she was frightened of Daniel because of his behavior. Daniel testified that he had never physically threatened or harmed Matthew. In Sara's testimony and affidavit, she recounted occasions upon which Daniel had become enraged, used profane language, and verbally harassed her in front of the children. She also made allegations of Daniel's slamming a door, throwing a telephone, throwing the kitchen table and chairs, pushing Sara's shoulder against a sliding glass door, using abusive and profane language toward Sara's sister, and scattering wedding programs around the house. Sara further testified that Daniel had made her feel threatened on several occasions, made menacing telephone calls, left a menacing message, and threatened suicide twice.

Daniel admitted becoming upset with Sara, raising his voice, using profane language, slamming the door, and throwing a telephone, but he denied the occurrence or contested the accuracy of Sara's testimony regarding other events. Daniel denied ever threatening suicide. He admitted becoming angry or upset when Sara "nagged" him. Daniel specifically denied making some of the menacing comments over the telephone and in messages, but he neither admitted nor denied some of Sara's allegations in that regard.

*Capacity to Provide Physical Care.*

Since Matthew's birth, Sara had been his primary caretaker. Before Sara and Daniel separated, Dillon had lived with them every other week until he started kindergarten; thereafter, he lived with them on a full-time basis. Sara had acted as Dillon's primary caretaker while he was in her house.

Sara testified that on January 9, 2003, when she was out of town, Matthew spent the night with Daniel. The next day Daniel took Matthew to daycare on a cold day without a hat, a coat, or mittens. Matthew therefore had not been able to go out for recess.

On January 26, Sara met with Daniel to pick Matthew up after visitation, and Matthew, who had been recovering from a bronchial inflammation, was in Daniel's vehicle without a hat, coat, or mittens.

After the separation, Sara occasionally left Matthew with a babysitter when she left town. She claimed that Daniel could not handle the boys when she and Daniel had resided together. Sara testified that during the marriage, when she was out of town, Daniel's mother, who died before the trial, had taken care of the boys on all but one occasion. In an affidavit, Sara alleged that while she was out of town in May 2002, she called home and Daniel told her "he could not handle the issues in his life and as a result his mother was there helping him with the children." Daniel denied telling Sara during the telephone conversation that he could not handle the issues in his life, although he admitted he may have stated that his life was difficult at that time.

Daniel testified that for 4½ years, he and Dillon's mother had shared the custody of Dillon during the school year, each parent having him every other week, and they had split the summers with regard to custody. For approximately 1 year before Daniel married Sara, he had cared for Dillon alone pursuant to this arrangement, and Daniel believed it had worked well for Dillon. Daniel testified that generally, he had been responsible for Dillon's medical and dental appointments.

Daniel testified that Sara had not done 100 percent of any of the childcare duties. He asserted that he had been significantly involved in Matthew's daily care since his birth, but Daniel admitted that Sara probably had done more of the day-to-day duties such as changing diapers and bathing. He claimed that when Sara traveled for work, he cared for Matthew. Daniel testified that although his mother had sometimes helped him with Matthew, Daniel had not required her help.

Daniel admitted that while he was unemployed, some days a babysitter had come into the house to watch Matthew. Sara testified that she had hired a babysitter during those periods because Daniel had told her he was looking for employment.

Daniel admitted that one evening while the trial was pending, he had forgotten to pick Matthew up at daycare and the daycare center had called Sara's house. Daniel had been counseling with

his attorney at the time, in a room without a watch or a clock, and he lost track of time.

Sara testified that at the time of trial, Daniel was delinquent on child support payments by 2 months.

*Health, Welfare, Social Behavior, and Educational Needs.*

Matthew had attended the same daycare center since he was 9 months old, and Sara characterized that daycare center as "[e]xcellent." Sara and the daycare's personnel believed Matthew had exhibited advanced intelligence. The parties agreed that Matthew seemed to be adjusting to the separation and divorce reasonably well, considering the situation.

Daniel testified that since the separation, he had encountered some disciplinary issues with Matthew. Before the separation, Daniel had been primarily responsible for disciplining Matthew. Daniel had learned of some discipline issues Matthew was having at daycare and opined that Matthew was "testing boundaries." After having twice discussed Matthew's discipline problems with the director of the daycare center, Sara claimed that she was not concerned about the issue.

Daniel testified that he believes he, rather than Sara, would be a better custodial parent for Matthew because Matthew, as a boy, needs a male influence in his life and because as a man, Daniel is better able to meet Matthew's developmental needs. Daniel believes that discipline is important, especially in divorce situations, and that a father generally does a better job of disciplining than a mother does.

Sara testified that she does not believe that joint custody is in her and Daniel's best interests. Sara testified that she should have legal and physical custody of Matthew because she is stable, loving, patient, caring, and employed. She also claimed that she and Matthew have a strong bond and that Matthew is her first priority. Sara asserted that Daniel should not have sole custody of Matthew because during the marriage, he did not actively attend to either Matthew or Dillon, but, rather, Daniel "laid around." Sara expressed concern for Daniel's emotional stability and suggested that his anger, depression, and other conditions would affect his parenting abilities.

## ASSIGNMENTS OF ERROR

On appeal, Sara assigns that the trial court erred in awarding the parties joint legal custody of Matthew. On cross-appeal, Daniel assigns that the district court erred in granting Sara primary physical custody of Matthew.

## STANDARD OF REVIEW

An appellate court reviews child custody determinations de novo on the record. Such determinations are initially entrusted to the discretion of the trial judge and will be affirmed unless they constitute an abuse of discretion. *Smith-Helstrom v. Yonker*, 249 Neb. 449, 544 N.W.2d 93 (1996). Where credible evidence is in conflict on a material issue of fact, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

## ANALYSIS

*Authority to Impose Joint Legal Custody.*

Both parties acknowledge that in *Elsome v. Elsome*, 257 Neb. 889, 601 N.W.2d 537 (1999), the Nebraska Supreme Court recognized that joint custody is composed of two elements—legal custody and physical custody. The Supreme Court noted that joint legal custody has been generally defined as joint authority and responsibility for making major decisions regarding the child's welfare and that in contrast, joint physical custody has been described as joint responsibility for minor day-to-day decisions and the exertion of continuous physical custody by both parents over a child for significant periods of time. The Supreme Court stated its agreement with an approach treating an arrangement as joint physical custody if the trial evidence so establishes, regardless of how prior decrees or court orders have characterized the arrangement.

Section 42-364(5) allows a trial court to order shared or joint custody, stating:

> After a hearing in open court, the court may place the custody of a minor child with both parents on a shared or joint custody basis when both parents agree to such an arrangement. In that event, each parent shall have equal rights to

make decisions in the best interests of the minor child in his or her custody. The court may place a minor child in joint custody after conducting a hearing in open court and specifically finding that joint custody is in the best interests of the minor child regardless of any parental agreement or consent.

In *Hildebrand v. Hildebrand*, 239 Neb. 605, 477 N.W.2d 1 (1991), the Nebraska Supreme Court determined that two requirements must be satisfied before a court may grant joint custody of a child: (1) The parents must agree to the arrangement, and (2) a hearing must be held to determine that such serves the best interests of the child. In 1993, after the decision in *Hildebrand*, the Legislature amended § 42-364. As a result of the 1993 amendment, a trial court may impose joint custody, even where the parties do not agree, if the trial court first conducts a hearing and specifically finds that joint custody is in the best interests of the minor child. See 1993 Neb. Laws, L.B. 629.

In *Dormann v. Dormann*, 8 Neb. App. 1049, 606 N.W.2d 837 (2000), this court reversed an order awarding the parties joint legal custody, with primary physical custody to remain with the father. In *Dormann*, we noted that the parties did not agree to the joint custody arrangement, nor did the district court make a specific finding that joint custody was in the best interests of the minor child. We also stated that joint custody is not favored by the courts of this state and will be reserved only for the rarest of cases. *Id.* (citing *Wilson v. Wilson*, 224 Neb. 589, 399 N.W.2d 802 (1987)).

Daniel argues that in codifying the public policy of this state, the Legislature lowered the standards for joint custody, shedding doubt on whether joint custody is still so disfavored and limited to rare cases. Daniel further argues that the Nebraska Supreme Court cases cited by Sara all involved joint physical custody as well as joint legal custody. See, *Wilson v. Wilson, supra*; *Korf v. Korf*, 221 Neb. 484, 387 N.W.2d 173 (1985); *Trimble v. Trimble*, 218 Neb. 118, 352 N.W.2d 599 (1984).

We agree that currently, § 42-364(5) clearly gives the trial court the authority to order joint custody even where one of the parents refuses to consent, if the court holds a hearing and specifically finds that joint custody is in the child's best interests. We also recognize the longstanding rule that joint custody is not

favored by the courts of this state and will be reserved for only the rarest of cases. *Wilson v. Wilson, supra*; *Dormann v. Dormann, supra.*

Under the previous version of the statute, joint custody was so disfavored that even with the agreement of both parties, the court was assigned the duty to conduct a hearing to determine if joint custody was in the child's best interests. Under the new version, joint custody remains disfavored to the extent that if both parties do not agree, the court can award joint custody only if it holds a hearing and makes the required finding. The statutory change was effected by 1993 Neb. Laws, L.B. 629, an amendment enacted by the same legislative action which adopted the Parenting Act, Neb. Rev. Stat. §§ 43-2901 to 43-2919 (Reissue 1998). The preamble of the Parenting Act provides:

> The Legislature finds it is in the best interests of a minor child to maintain, to the greatest extent possible, the ongoing involvement of both parents in the life of the minor child. The Legislature further finds that parents should maintain continued communications to make as many joint decisions in performing such parenting functions as are necessary for the care and healthy development of the minor child.
>
> In any proceeding between parents . . . involving a minor child, the best interests of the minor child shall be the standard by which the court adjudicates and establishes the individual parental responsibilities. The state presumes the critical importance of the parent-child relationship and the child-parent relationship in the welfare and development of the minor child and that the relationship between the minor child and both parents should be fostered unless otherwise inconsistent with the best interests of the minor child. The best interests of the minor child are served by a parenting arrangement which best serves a minor child's emotional growth, health, stability, and physical care.
>
> The Legislature further finds that the best interests of the minor child are ordinarily addressed when both parents remain active and involved in parenting. It is the policy of this state to assure the right of children, when it is in their best interests, to have frequent and continuing contact with parents who have shown the ability to act in the best interests

of the children and to encourage parents to share in the rights and responsibilities of raising their children after divorce or separation.

§ 43-2902. The preamble does not read as though the Legislature disfavors joint custody, if such will be in the child's best interests. By enacting the Parenting Act, the Legislature was attempting to adjust the then-current law, and the act clearly evidences an attempt to foster participation of both parents of a separated family in raising their children. The trial court has the authority to make a determination of joint custody if it follows the provisions of § 42-364(5). In the instant case, the trial court conducted the required hearing and made the required finding.

*Review of Joint Legal Custody for Abuse of Discretion.*

The question therefore becomes whether the trial court's determination that joint legal custody was in the best interests of Matthew constituted an abuse of discretion.

We have already summarized the evidence presented to the trial court on this issue, much of which evidence was in conflict. We recall that the trial court's decree in the instant case imposed only joint legal custody, while assigning sole physical custody to Sara. The testimony of the mental health professionals supports Daniel's ability to effectively perform parental responsibilities, at least to the extent of participating in major decisions.

The marital strife recounted primarily through Sara's testimony stands in stark contrast with Daniel's successful performance of a joint custody arrangement concerning Matthew's half brother, Dillon. The trial court had a better opportunity than this court to observe the witnesses and to resolve conflicts in the testimony. The trial court evidently determined that Daniel's performance in the custodial relationship regarding Dillon provided a better prediction of Daniel's ability to cooperate with Sara and make joint decisions in Matthew's best interests than did the specific incidents of questionable behavior during the marital breakdown.

Further, we share the concern that if given sole legal custody along with her primary physical custody, Sara would not assume responsibility to foster the relationship between Matthew and Daniel in the manner contemplated by the Parenting Act. By granting both parties joint legal custody, under the particular

circumstances present in the instant case, we best implement the goal expressed by the Legislature that parents share in the rights and responsibilities of raising their child after divorce.

We conclude that the trial court did not abuse its discretion in granting joint legal custody of Matthew to the parties.

*Physical Custody.*

Daniel cross-appeals, asserting that he should have been granted primary physical custody of Matthew. He makes three arguments to support this contention.

■ Daniel contends that Matthew should not be separated from his half brother, Dillon. While Nebraska cases have recognized that it is sound public policy to keep siblings together when a marriage is dissolved, see *Ziebarth v. Ziebarth*, 238 Neb. 545, 471 N.W.2d 450 (1991), such cases recognize that the ultimate test remains the best interests of the children. The evidence persuades us that Sara will continue to foster a close and loving relationship between Matthew and Dillon. Further, the evidence demonstrates that during the marriage, Sara fulfilled the primary caretaking responsibilities and provided the great majority of the day-to-day care of both children when they resided in the marital home. Furthermore, the behavioral issues concerning Daniel, while not sufficient to preclude joint participation in major decisions, support the trial court's determination regarding physical custody.

Daniel again argues that Sara will not assume responsibility to foster a relationship between Matthew and Daniel. While consideration of this factor alone might weigh in favor of Daniel, the other factors properly considered by the trial court support granting Sara physical custody of Matthew.

Finally, Daniel argues that there is a strong likelihood that Sara would desire to relocate to San Francisco. The matter of removing Matthew from Nebraska is not presented in the instant case, and Daniel's argument in this regard clearly constitutes mere speculation. The evidence supports the trial court's determination to grant Sara physical custody of Matthew, and we find no abuse of discretion in that decision.

## CONCLUSION

Because we find that the trial court followed the applicable statute and made the necessary finding and that the court's decree

awarding the parties joint legal custody of Matthew and granting Sara sole physical custody of Matthew was not an abuse of discretion, we affirm.

AFFIRMED.