IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

DEWING V. DEWING

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

RYAN L. DEWING, APPELLEE,

V.

KELLY M. DEWING, APPELLANT.

Filed March 26, 2019.    No. A-18-695.

Appeal from the District Court for Cass County: MICHAEL A. SMITH, Judge. Affirmed.

Terrance A. Poppe and Anne E. Brown, of Morrow, Poppe, Watermeier & Lonowski, P.C., L.L.O., for appellant.

Mark J. Krieger and Terri M. Weeks, of Bowman & Krieger, for appellee.

MOORE, Chief Judge, and RIEDMANN and BISHOP, Judges.

BISHOP, Judge.

The marriage of Ryan L. Dewing and Kelly M. Dewing was dissolved by decree on March 23, 2018. Kelly only appeals the portions of that decree entered by the Cass County District Court awarding legal and physical custody of the parties' two children to Ryan. We affirm.

BACKGROUND

Kelly and Ryan were married in 2004 and had two children during their marriage, a son born in 2009 and a daughter born in 2011. Ryan filed for divorce in January 2017; he asked that custody of the parties' two children be awarded to him. Kelly filed a responsive pleading and counterclaim; she sought joint custody of the children, but in the event the district court determined that joint custody was not in the best interests of the children, she asked that custody be awarded to her. Both parties filed motions for temporary relief, and the district court entered a temporary order on March 1, awarding "the care, custody and control" of the parties' children to Ryan.

- 1 -

However, the parenting plan incorporated into the temporary order awarded joint legal custody of the children to the parties, with physical custody awarded to Ryan, subject to Kelly's rights of parenting time. The parenting plan established a "School Year Schedule" which allowed Kelly parenting time every other weekend from 5 p.m. Thursday to 8 a.m. Monday morning (a 10/4 parenting time schedule). The parenting plan established a holiday parenting time schedule for the parties, but was silent as to summer. Pursuant to the temporary order, Kelly was to pay $644 per month to Ryan for child support.

In May 2017, Kelly filed a motion asking the district court to award "summer parenting time on a week on/week off basis commencing with the summer of 2017." In July and August, she filed motions asking the court to award her a "week on week off parenting time schedule between now and the time of trial." No rulings on these motions appear in our record.

Trial took place on December 7, 2017. We will discuss the trial evidence relevant to the errors assigned in our analysis below. A decree dissolving the marriage was entered by the district court on March 23, 2018.

Relevant to this appeal, the district court awarded legal and physical custody of the children to Ryan, subject to Kelly's rights of parenting time as set forth in the parenting plan attached to the property settlement agreement; the property settlement agreement was attached to and made part of the decree by reference. The parenting plan established a "School Year Schedule" which allowed Kelly parenting time every other weekend from 5 p.m. Thursday to 8 a.m. Monday morning, awarded each party one 2-week parenting time period during the summer months, and established a holiday parenting time schedule. Because Kelly has alcohol addiction issues, the parenting plan also included a safety plan wherein during all periods of parenting time, Kelly was not to consume alcoholic beverages of any kind, at any time, and was to only take narcotics as prescribed and directed by her physician. If Kelly relapsed during a period of her parenting time, her parenting time was to end as soon as the children could be transported safely to Ryan. Kelly was required to enroll and participate in the "Level 2 Soberlink Program" for a period of 7 years from the entry of the decree. As part of that program she was to test four times per day during any period of her parenting time (the four 1-hour testing periods were from 8 to 9 a.m., 12 to 1 p.m., 5 to 6 p.m., and 10 to 11 p.m.). In the event Kelly failed a test, she forfeited her remaining period of parenting time with the children and they were to be immediately returned to Ryan until the commencement of Kelly's next regularly scheduled parenting time. Kelly was also to list Ryan as a concerned party to receive real time updates and weekly or monthly reports of all testing performed or missed by Kelly on the Soberlink Program. Pursuant to the Decree, Kelly was ordered to pay Ryan child support in the amount of $768 per month.

On April 2, 2018, Kelly filed a motion for new trial. After a hearing on May 31, the district court entered an order on June 18 granting Kelly's motion in part, "in that the requirement for use of the Soberlink device . . . shall expire three (3) years after the entry of the Decree." All other requested relief was denied. Kelly timely appealed.

ASSIGNMENTS OF ERROR

Kelly assigns that the district court erred in awarding legal and physical custody of the children to Ryan.

## STANDARD OF REVIEW

In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017).

Parenting time determinations are also matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Aguilar v. Schulte*, 22 Neb. App. 80, 848 N.W.2d 644 (2014).

An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Flores v. Flores-Guerrero*, 290 Neb. 248, 859 N.W.2d 578 (2015).

When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Donald v. Donald, supra*.

## ANALYSIS

### Evidence at Trial

Ryan (age 39) and Kelly (age 37) each testified at trial. Ryan is a compliance director at a company in Lincoln, Nebraska. Kelly has worked for a hospital in Lincoln for 11 years. She started as a "RN" in the cardiovascular intensive care unit. She moved around to various positions in the hospital and is now a patient advocacy and experience consultant. At the time of trial, the parties' son was 8 years old and their daughter was 6 years old.

Ryan and Kelly both testified that Kelly is an alcoholic. She had been convicted of driving while intoxicated two times (1999 and 2010), and she continued to drink alcohol during and after her probation for the 2010 conviction. Her drinking got worse over time and caused a strain in their marriage. She went into inpatient treatment in October 2016, shortly before Ryan filed for divorce in January 2017.

Ryan testified that his relationship with Kelly "started to deteriorate as [her] alcoholism got worse." Ryan tried "to protect the kids" by trying to keep them away from it, and keeping a sense of normalcy for dinner times, bedtimes, and daily routines. As Kelly's alcoholism got worse, he took on more roles at home. And even after Kelly got done with treatment in November 2016, she was driving to Omaha, Nebraska, for aftercare and then would come home and "seclude" herself in the basement, so the parenting obligations fell on him. But according to Kelly, the parties generally shared in the parenting and household tasks.

Ryan testified about concerns he had with Kelly driving the children. One time (no specific timeframe given, but presumably before Kelly's inpatient treatment in October 2016), Kelly had driven into a ditch when she and the children were driving to her son's friend's home. It was the children, not Kelly, who told Ryan about the incident, and when he asked her if she had been drinking, she did not admit to it. (In her testimony, Kelly denied getting in car accidents with children in the car after she had been drinking, and she said she was not drinking when driving to

her son's friend's home. However, when asked if she ever drank and drove with her children, she acknowledged that she had.)

Ryan was asked if he believed Kelly when she said that she had not been drinking or that she had been sober, and he said, "I do not believe that she's been sober, no." "[A]s the alcoholism got worse . . . really the only periods of time that she was sober . . . was in the mornings right when she got up[.]" Ryan adjusted his work schedule so that he would go into work early and then be able to pick the children up and be around for them in the afternoons and evenings.

Shortly before Kelly went into treatment, Ryan and the children drove from the family home in Eagle, Nebraska, to her office in Lincoln to find out why she had not come home from work. Kelly met them in the parking lot and got in the car; it was "very evident" that she was intoxicated because she could "barely walk," could not hold her head up, and "passed out" on the way home. The next morning Ryan went to Kelly's office with her and found vomit on the floor and bottles of vodka.

In October 2016, Ryan left the house in the morning. Later, he could not reach Kelly on her phone and even tried to FaceTime the children on their iPads. As he was driving home, his son finally answered Kelly's phone and said that Kelly was in bed and could not get up. When Ryan got home, the children were downstairs playing and Kelly was upstairs on the floor, unable to move. He contacted his sister to come get the children. Then he carried Kelly out to the car and drove her to the hospital. "The whole time" Kelly said she had not been drinking, but she vomited inside the car. At the hospital they did a blood draw. Kelly told him that her alcohol level was ".403 or .42 or something like that," and she then admitted that she had been drinking. (Kelly acknowledged in her testimony that her blood alcohol content was .403.) After this point, Kelly was ready to go to treatment.

When Kelly got out of treatment in November 2016, she started an aftercare program in Omaha. Ryan became concerned that Kelly may have developed a relationship with a man attending the aftercare program. Ryan asked Kelly not to go to the program in Omaha anymore "[t]o stop seeing him." She eventually stopped going. She did not transfer to an aftercare program in Lincoln.

The safety plan in the March 2017 temporary order allowed Ryan to confirm Kelly's sobriety through an alcohol-censored device if he believed that she was under the influence of alcohol at any time during her parenting time. Ryan acknowledged that he had used a handheld breathalyzer outside the presence of the children to check whether Kelly was sober before he let the children go with her. At that point, "[t]he exchanges [became] very, very volatile with screaming and yelling at me. 'Why do you have to do this? You don't have to do this.'" One time the parties' son came outside when Ryan was trying to do a breathalyzer, and Ryan tried to get him to go back inside. Ryan stated, "[Kelly] starts screaming and yelling at me, cursing at me, yelling at [our son]. 'Can you believe your daddy's making me do this? Your daddy's such an asshole.'" (Kelly denied calling Ryan an asshole in front of their son.)

On another occasion, Kelly picked the children up from daycare and took them out for ice cream during Ryan's parenting time without his permission. Ryan later talked to her about not doing that and she acted "[v]ery negatively" yelling and screaming. Kelly apparently testified in her deposition that when the children asked again whether they could go for ice cream, she said, "'No, Daddy won't let us.'"

When asked what his relationship with Kelly is now, Ryan responded, "I don't really think we have one today. We communicate via text message at times and then talk on the phone." He affirmed that most conversations end up in an argument. As the case has gone on, their ability to communicate has decreased. If there are conversations, discussions, or if he has an argument with Kelly, Ryan sends the children upstairs or the parties go outside "just to try to keep them completely separate . . . from that." There were disputes between the parties in front of the children after the entry of the temporary order. When those disputes arose, Ryan would tell Kelly that it needs to stop and that the children do not need to be a part of it, but Kelly would not respond in a positive manner. "She's very, very volatile, comes with screaming and yelling. 'Look what your daddy's making me do.' Swearing at me in front of the kids. Very volatile actions."

Ryan testified that the children have adjusted well to the 10/4 parenting schedule from the temporary order. His suggested parenting plan at trial was to continue a 10/4 schedule, with each parent getting one 2-week period during the summer. He said a change from the 10/4 schedule would be difficult for the children because the 10/4 schedule provides the consistency that they need. To confirm Kelly's sobriety, he suggested a safety plan including a "Level 2 Soberlink" program with set testing periods on the days she has the children. Ryan did not think that he and Kelly could make joint decisions.

Although the temporary parenting plan did not provide Kelly any extra parenting time in the summer, Ryan acknowledged, on cross-examination, that the parties did do week-on-week-off parenting for a period of time in the summer and that the children did "okay." He insisted they go back to the 10/4 schedule when school started because "[i]t provided a consistent school time frame for the kids. So the morning routine, getting up, coming home after school, to provide that consistency during the school year." He acknowledged that there had not been a problem with Kelly getting the children to school on the Friday and Monday mornings during her parenting time.

Ryan's sister and brother-in-law both testified at trial. They saw Ryan and the children a couple of times a month. Both had seen Kelly intoxicated while the children were present. And both testified that they have had to leave social events to take care of the parties' children, and they have had to leave concerts early because of Kelly's intoxication. Ryan's brother-in-law testified that within "the past couple years," he received a call from Ryan saying that Kelly was in a ditch; when the brother-in-law arrived at the scene, Kelly's car was stuck in a ditch and "she was completely nonresponsive" and he had to "drag her" out of her car and put her into his vehicle to take her to Ryan. (The children were not in the car with Kelly.) Ryan's sister testified that before Kelly went to treatment, she (the sister) saw the children "increasingly getting more anxious." When Kelly was away in treatment "it was kind of back to their old selves." And then when Kelly returned, "there seemed to be a lot more conflict in the home" and the sister "definitely noticed . . . a difference at that point." After Kelly left the marital residence in May 2017, the children have seemed "a little bit more calm." On cross-examination the sister also acknowledged that the children were generally calm during the summer when Kelly and Ryan had alternating weeks of parenting time. Ryan's sister believed it was best for the children to reside primarily with Ryan. She said that Ryan is "a very good parental figure," he is "very calm," and "'[c]onsistency' is the word that comes to mind." The brother-in-law acknowledged that he had not seen Kelly since she went to treatment, but when he saw Kelly with the children she appeared loving.

Kelly acknowledged that she is an alcoholic. In 2016, Kelly was drinking "daily." She went into treatment that October after "winding up in the emergency department, my children finding me unconscious, essentially -- that was rock bottom"; "[m]y blood alcohol was lethal." Kelly was in inpatient treatment for 28 days. (On cross-examination, Kelly acknowledged that she failed a drug test and two retests while in treatment; it appears it was Xanax, a benzodiazepine; she had a prescription for Xanax but was not to have it in the facility.) Kelly stated that while in treatment, "I learned that [alcohol is] toxic to me, that I just don't tolerate it the way others do." "I learned that I could be free of it and that I could still - I could enjoy life without it." In treatment there was programming about relapse prevention. "AA is so important [because] an alcoholic understands what another alcoholic's been through." After inpatient treatment, Kelly was involved in an aftercare program in Omaha. She "went, maybe, four times," and had a relationship with a person in that program. Kelly said she left the program in Omaha in mid-December because "[Ryan] requested that I do that." She acknowledged that she did not feel she had the ability to tell him no when he asked her to get out of the program. On cross-examination, Kelly acknowledged that after she quit going to Omaha, she did not find an aftercare program in Lincoln. She said, "[t]he recommendation wasn't made when I [was] discharged from the . . . outpatient one in Omaha." Although Ryan's counsel questioned whether Kelly was discharged or just stopped going, Kelly did acknowledge that she had not complied with the recommendation of the inpatient treatment facility.

Now Kelly goes to AA meetings once a week and has counseling sessions with Debra Knight. Kelly also worked with another counselor from November/December 2016 to January 2017, but decided to stay with Knight. In addition, Kelly has a close colleague who has a daughter and a significant other in recovery; her friend is getting a counseling degree "and it's like I have a built-in counselor that I work with every day." And Kelly said her parents are "pretty supportive." Kelly also takes medication for depression and anxiety.

Kelly stated her sobriety date is October 10, 2016. She "can't give any assurance" that she will never drink again, "[n]o alcoholic can." She can only focus on "[o]ne day at a time." But she does understand that if she drinks, she will not be able to be a mother to her children. Kelly said that Ryan tested her 12 to 15 times during the pendency of this action and she never had a positive test.

Kelly would prefer to be the custodial parent, but fears she will "be back in this courtroom every month" until custody is "in [Ryan's] favor." So she is suggesting a week-on-week-off parenting time arrangement. The parties had week-on-week-off parenting time for a while in the summer and the children "really loved it." As part of her suggested parenting plan, Kelly would do a "Level 1 Soberlink" for a period of 1 year, and if she were to test positive her parenting time would be suspended. (Her understanding is that Level 1 is testing only when she has the children whereas Level 2, which Ryan suggested, is testing every day.) Kelly has concerns about Ryan being awarded primary custody because, "I have concerns about his ability to be organized" and "I have concerns about his priorities and the kids' nutrition and . . . every time I see my daughter when she's with her dad she has something all over her face. And I know that's vain to be concerned about my daughter's appearance, but I am."

When asked to describe the parties' ability to communicate at this point, Kelly responded, "I say we're perfectly capable of communicating." She denied that communication always ends

up in a fight, as Ryan had testified. She also felt that the parties are "100 percent capable" of talking and making joint decisions about their children. She said that they had been able to agree on property division, alimony, a summer schedule, and extracurricular activities, among other things. What they cannot agree on is whether the parenting schedule should be equal or a 10/4 schedule. Kelly testified that the 10/4 parenting schedule has been "[e]xcruciating." And she feels that week-on-week-off parenting time is just as consistent as a 10/4 schedule. When she has the children on a school night she helps them with their homework and there have been no problems with attendance or the children being tardy during her parenting time.

Debra Knight is licensed in both mental health counseling and drug and alcohol counseling. She worked with Kelly through an employee assistance program, and had been providing counseling to her since November 2016. The first three or four sessions were couples' counseling with Kelly and Ryan. There was "a lot of emotion and a lot of conflict within the sessions." Then Kelly started individual sessions and those sessions were "much more controlled emotionally." Since January 2017, Knight had been working with Kelly on processing the pending divorce, the feelings and the adjustment. According to Knight, Kelly appeared to be committed to her children. The services Knight provided to Kelly did not focus on recovery or relapse prevention.

Dr. George Williams is a licensed clinical psychologist who specializes in behavioral pediatrics. Although Dr. Williams did not testify at trial, his deposition testimony was received into evidence and reveals the following. It has been Dr. Williams' experience that the "original Wilson v. Wilson parenting plan -- every other weekend, every other Wednesday -- was pretty disruptive to children, it was disruptive to family systems, it did not allow the non-custodial parent to have meaningful time with their children." "[W]e found, through clinical experience, that the more continuity a child had with each parent . . . the fewer emotional/behavioral/learning problems we saw." Dr. Williams stated,

> [U]ltimately, that evolved into a . . . recommendation of a nine/five, ten/four type of visitation schedule, taking that Wednesday, putting it on the weekends, offering another day, just to get the non-custodial parent involved in transitions back to school, faith-based responsibilities, over the course of . . . four or five days, which gave children a more complete view of the non-custodial parent and the non-custodial parent to have an opportunity to have a more meaningful relationship and influence on their development.

Dr. Williams has had experience with cases involving an even division of parenting time. He said that an even division of parenting time "takes an extraordinarily [sic] relationship"; "the divorce is mutual, there's no real conflict, they are, are very much on the same page when it comes to academic achievement, faith, extracurricular activities, they communicate without a sense of ownership, it can work fine." "[T]he transitions, obviously, are about the same . . . 50-50 versus a nine/five," but "it requires a lot more communication." "[A] week's worth of academic, social, emotional issues, if not communicated accurately, can lead to trouble." Cooperation is "absolutely" required and if there is not communication, "then we're just traumatizing the children for an extended period of time." Dr. Williams said it takes "flexibility" and a "strong awareness" of what "parent alienation" is, and that a parent has to be a good advocate for their children and for the other parent across their entire family system.

According to a letter authored by Dr. Williams, which was received into evidence, he had nine clinical contacts with the Dewing family between July 10 and November 7, 2017. He met with each parent twice individually, had one session with the children together, and then two individual sessions with each child. Both parents also participated in pre- and/or post child session telephone conversations to discuss Dr. Williams' observations of the children, concerns, and treatment recommendations. During his deposition, Dr. Williams was asked if he had an opinion as to whether Kelly and Ryan share the sort of communication and cooperation necessary to make an equal division of parenting time beneficial to their children. Dr. Williams responded, "Not from what I've got through the children and/or each parent. I mean, there's a lot of conflict." He also said, "I would say the way [Kelly and Ryan] interact with each other right now, a 50-50 [parenting time schedule] that would require a lot of communication would not go well." However, Dr. Williams said the children have strong relationships with both parents, and he "can't make a decision regarding custody." When asked if he had any reason to believe that there would be any harm to the children if the current parenting time of a 10/4 schedule were to remain in effect going forward, Dr. Williams responded, "No." "[A]gain, it really comes down to how parents conduct themselves, and that will determine child adjustment, child issues."

On cross-examination, Dr. Williams was asked if he was saying a "seven/seven" parenting time schedule cannot work in this case. He responded, "[N]o, but they'd have to engage in a lot of change, that's for sure." Dr. Williams acknowledged that Kelly and Ryan are making progress in how to deal with the divorce and the issues it creates with their children. He also acknowledged that there are studies that conclude a "seven/seven" parenting time schedule is beneficial for children, and he has seen couples make that schedule work. But, "if it's going to work, again, similar to the other ones, you have to have parents that are -- have a division of labor and that there's communication." "[R]ealizations from children that parents are still co-parenting, . . . that helps in their development."

> When asked what sort of suggestions he had made to Kelly and Ryan, Dr. Williams stated, I've told them to make sure that the visitation is consistent, that there's no conflict at the time of exchange, that you know, when children . . . are leaving, not to be overly emotional, be saying things like, well, I can't come to that; Mom won't let me or Dad won't let me, to not bring in legal issues, you know, I can't change visitation until we go to court, things like, you know, making sure your extended family are supportive of the other parent when it comes up in conversation; just, again, protect the children from . . . the legal process, the conflict, and our own burdens, whether they're financial, emotional, therapy burdens, whatever they might be, that that's not really information that benefits child development.

According to Dr. Williams, there had been improvement, but "there's still things that are happening during exchanges, or phone calls I think are a bit intrusive when the children are in the other home; . . . that they're working on." But, the Dewings' son "isn't really demonstrating yet that there's good communication, open communication, co-parenting going on between [Kelly] and [Ryan], so that tells me . . . there's a lot more to do. And . . . so . . . I don't think they're there yet."

There was also evidence from other witnesses (friends) who spoke favorably about the parties' parenting abilities.

In the decree, the district court stated:

> Given the evidence of [Kelly's] addiction and of her behavior while under the sway of that addiction, and further considering the difficulties in communication between the parties, the Court cannot find that joint physical and legal custody is in the best interests of the minor children. Accordingly, the care, custody and control of the minor children of the parties, both legal and physical, is to be vested in [Ryan], subject to rights of [parenting time] vested in [Kelly] as set forth in the Parenting Plan attached to the Property Settlement Agreement.

And as stated previously in this opinion, the parenting plan established a "School Year Schedule" which allowed Kelly parenting time every other weekend from 5 p.m. Thursday to 8 a.m. Monday morning (a 10/4 schedule), awarded each party one 2-week parenting time period during the summer months, and established a holiday parenting time schedule.

APPLICABLE LAW

Keeping the evidence and the district court's findings in mind, we now consider the legal principles governing custody and parenting time matters. When deciding custody issues, the court's paramount concern is the child's best interests. *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012). Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) states, in pertinent part:

> In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:
>
> (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;
>
> (b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;
>
> (c) The general health, welfare, and social behavior of the minor child;
>
> (d) Credible evidence of abuse inflicted on any family or household member. . . ; and
>
> (e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

The Parenting Act defines "[j]oint legal custody" as "mutual authority and responsibility of the parents for making mutual fundamental decisions regarding the child's welfare, including choices regarding education and health." Neb. Rev. Stat. § 43-2922(11) (Reissue 2016). Courts typically do not award joint legal custody when the parties are unable to communicate effectively. See, *Kamal v. Imroz*, 277 Neb. 116, 759 N.W.2d 914 (2009) (joint decisionmaking by parents not

in child's best interests when parents are unable to communicate face-to-face and there is level of distrust); *Klimek v. Klimek*, 18 Neb. App. 82, 775 N.W.2d 444 (2009) (no abuse of discretion by district court's failure to award joint custody when minor child was confused by temporary joint legal and physical custody arrangement and parents had hard time communicating with one another). However, a trial court's decision to award joint legal or physical custody can be made without parental agreement or consent so long as it is in the child's best interests. And appellate courts have in some instances declined to reverse trial court decisions where joint custody has been awarded or maintained even when the evidence demonstrates a lack of communication or cooperation between parents. See, *State on behalf of Jakai C. v. Tiffany M.*, 292 Neb. 68, 871 N.W.2d 230 (2015) (Nebraska Supreme Court affirmed district court's denial of father's request to modify custody from joint legal custody (mother with physical custody) to sole legal and physical custody despite apparent inability of parties to parent cooperatively with one another); *Kay v. Ludwig*, 12 Neb. App. 868, 686 N.W.2d 619 (2004) (this court affirmed district court's award of joint legal custody, with physical custody of parties' minor son awarded to mother, despite failure of parties to agree on joint legal custody and mother's testimony that communication between herself and father had been nearly nonexistent and that they have had number of confrontations since separation). However, the key to all of the cases cited above was the appellate court's deference to the trial judge who had heard and observed the witnesses.

### DID DISTRICT COURT ABUSE ITS DISCRETION?

Kelly argues that the only concern Ryan had about the parties being awarded joint custody is Kelly's prior alcohol use, and that such concern has been addressed by requiring her to participate in the SoberLink program. Additionally, the parties had joint legal custody under the temporary order, but the district court ultimately awarded sole legal custody to Ryan. Kelly contends that the district court "[did] not address legal custody separate, but simply awards sole legal custody to Ryan." Brief for appellant at 13-14.

Based on the evidence described above, including Dr. Williams' deposition testimony, we cannot say the district court abused its discretion by awarding Ryan legal and physical custody of the children. The district court did not address legal custody separately from physical custody, but its reason for both was, in part, the difficulties in communication between the parties. As we stated previously, courts typically do not award joint legal custody when the parties are unable to communicate effectively. And deference is given to the district court who heard and observed the witnesses.

Although Kelly testified that the parties are "perfectly capable of communicating" and are "100 percent capable" of talking and making joint decisions about their children, Ryan disagreed. And Dr. Williams, who had met with both parties and the children, noted the parties' communication problems. Additionally, Dr. Williams testified about the communication and cooperation necessary for a "50-50" parenting time schedule to work, and he did not believe the parties had the type communication and cooperation required. He stated that "there's a lot of conflict" and that "a 50-50 [parenting time schedule] that would require a lot of communication would not go well." Ryan testified that during the temporary order Kelly was screaming and yelling at him in front of their son when Ryan tried to breathalyze her (per the safety plan); she also said, "'Can you believe your daddy's making me do this? Your daddy's such an asshole.'" (Although

Kelly denied calling Ryan an asshole in front of their son.) Ryan also testified that when disputes arose during the temporary order, he would tell her the children did not need to be a part of it, but Kelly did not respond in a positive manner. "She's very, very volatile, comes with screaming and yelling. 'Look what your daddy's making me do.'" These are exactly the conflicts that Dr. Williams was concerned about that would make a joint custody arrangement unlikely to be successful.

There is certainly evidence in the record to indicate that the week-on-week-off parenting time in the summer preceding trial worked well and that the children enjoyed it. There is also evidence that Kelly had been committed to her sobriety for the year preceding trial, and that she had a good, loving relationship with the children and had been an integral part of their lives. When considering such evidence, it is understandable why Kelly believes a 50/50 joint custody arrangement would work. However, in light of the other evidence discussed above which shows ongoing conflict between the parties and an inability to reasonably communicate with one another, we can also understand why the district court decided against joint custody at this time. Therefore, in light of the evidence presented, and giving deference, as we must, to the district court who heard and observed the witnesses, we cannot say the court abused its discretion in awarding legal and physical custody of the children to Ryan.

CONCLUSION

For the reasons stated above, the judgment of the district court is affirmed.

AFFIRMED.